(1)

STATE OF NEW YORK
COUNTY COURT        COUNTY OF ERIE

---

KEYBANK NATIONAL ASSOCIATION,

                                        Plaintiff,

-vs-

**SUMMONS**

FILED

JAN 2 1 2015

ERIE COUNTY
CLERK'S OFFICE

DEBORAH A. BUCZEK A/K/A DEBORAH ANN GALE
BUCZEK A/K/A DEBORAH ANN GALL BUCZEK
A/K/A DEBORAH GALL BUCZEK; NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE CIVIL ENFORCEMENT - BUFFALO DO;
NEW YORK STATE DEPARTMENT OF TAXATION
AND FINANCE CIVIL ENFORCEMENT - REGION 1A;
UNITED STATES OF AMERICA;
"JOHN DOE" AND "JANE DOE " said
names being fictitious, it being the intention of
Plaintiff to designate any and all occupants of premises
being foreclosed herein,

Index No.
2015600022

                                        Defendants.

---

Mortgaged Premises:
7335 DERBY ROAD
DERBY, NY 14047

TO THE ABOVE NAMED DEFENDANT(S):
    YOU ARE HEREBY SUMMONED to answer the Complaint in the above entitled action
and to serve a copy of your Answer on the plaintiff's attorney within twenty (20) days of the
service of this Summons, exclusive of the day of service, or within thirty (30) days after service
of the same is complete where service is made in any manner other than by personal delivery
within the State. The United States of America, if designated as a defendant in this action, may
answer or appear within sixty (60) days of service.   Your failure to appear or to answer will result
in a judgment against you by default for the relief demanded in the Complaint. In the event that a
deficiency balance remains from the sale proceeds, a judgment may be entered against you,
unless the Defendant obtained a bankruptcy discharge and such other or further relief as may be
just and equitable.

**NOTICE**
**YOU ARE IN DANGER OF LOSING YOUR HOME**

**If you do not respond to this summons and complaint by serving a copy of the**

answer on the attorney for the mortgage company who filed this foreclosure proceeding against you and filing the answer with court, a default judgment may be entered and you can lose your home.

Speak to an attorney or go to the court where your case is pending for further information on how to answer the summons and protect your property.

Sending a payment to your mortgage company will not stop this foreclosure action.

**YOU MUST RESPOND BY SERVING A COPY OF THE ANSWER ON THE ATTORNEY FOR THE PLAINTIFF (MORTGAGE COMPANY) AND FILING THE ANSWER WITH THE COURT.**

ERIE County is designated as the place of trial.  The basis of venue is the location of the mortgaged premises.

Dated: January 7, 2015

Mark K. Broyles, Esq.
FEIN, SUCH & CRANE, LLP
Attorneys for Plaintiff
Office and P.O. Address
28 East Main Street, Suite 1800
Rochester, New York 14614
Telephone No. (585) 232-7400
FKNC2913

Section: 206.04
Block: 2
Lot: 22

## NATURE AND OBJECT OF ACTION

The object of the above action is to foreclose a mortgage held by the Plaintiff recorded in the County of ERIE, State of New York as more particularly described in the Complaint herein.

TO THE DEFENDANT, except **DEBORAH A. BUCZEK A/K/A DEBORAH ANN GALE BUCZEK A/K/A DEBORAH ANN GALL BUCZEK A/K/A DEBORAH GALL BUCZEK**, the plaintiff makes no personal claim against you in this action.

# Help for Homeowners in Foreclosure

New York State Law requires that we send you this notice about the foreclosure process.  Please read it carefully.

## Summons and Complaint

You are in danger of losing your home.  If you fail to respond to the summons and complaint in this foreclosure action, you may lose your home. Please read the summons and complaint carefully.  You should immediately contact an attorney or your local legal aid office to obtain advice on how to protect yourself.

## Sources of Information and Assistance

The State encourages you to become informed about your options in foreclosure.  In addition to seeking assistance from an attorney or legal aid office, there are government agencies and non-profit organizations that you may contact for information about possible options, including trying to work with your lender during this process.

To locate an entity near you, you may call the toll free helpline maintained by the New York State Department of Financial Services at 1-800-342-3736 or visit the Department's website at www.dfs.ny.gov.

## Foreclosure Rescue Scams

Be careful of people who approach you with offers to "save" your home. These are individuals who watch for notices of foreclosure actions in order to unfairly profit from a homeowner's distress.  You should be extremely careful about any such promises and any suggestions that you pay them a fee or sign over your deed.  State law requires anyone offering such services for profit to enter into a contract which fully describes the services they will perform and fees they will charge, and which prohibits them from taking any money from you until they have completed all such promised services.

§ 1303 Notice                                                          52714

STATE OF NEW YORK
COUNTY COURT          COUNTY OF ERIE

---

KEYBANK NATIONAL ASSOCIATION,

        Plaintiff,

-vs-                                                    **COMPLAINT**

DEBORAH A. BUCZEK A/K/A DEBORAH ANN GALE
BUCZEK A/K/A DEBORAH ANN GALL BUCZEK
A/K/A DEBORAH GALL BUCZEK; NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE CIVIL ENFORCEMENT - BUFFALO DO;
NEW YORK STATE DEPARTMENT OF TAXATION
AND FINANCE CIVIL ENFORCEMENT - REGION 1A;
UNITED STATES OF AMERICA;
"JOHN DOE" AND "JANE DOE " said names being          Index No.
fictitious, it being the intention of Plaintiff
to designate any and all occupants of premises
being foreclosed herein,

        Defendants.

---

The plaintiff herein, by FEIN, SUCH & CRANE, LLP, its attorneys, complains of the

defendants above named, and for its cause of action, alleges:

**FIRST:** The plaintiff is a national association, duly licensed, organized and existing

pursuant to the laws of the United States of America, doing business in the State of New York.

**SECOND:** Upon information and belief, at all times hereinafter mentioned, the

defendant(s) reside or conduct business at the address set forth in "Schedule A" annexed hereto

(any that are corporations being organized and existing under the laws of the State set forth

therein), and are made defendants in this action in the capacities and for the reasons alleged

therein.

**THIRD:** That the United States of America, the People of the State of New York, the

State Tax Commission of the State of New York, the Industrial Commissioner of the State of

New York, and all other agencies or instrumentalities of the Federal, State or local government,

however designated, if named as defendants, are made parties solely by reason of the facts set forth in the annexed "Schedule B."

FOURTH: That heretofore, to secure a sum of money to the stated Lender, its successor and assigns, the defendants duly executed, acknowledged and delivered to the stated Lender, a certain bond(s) or note(s) whereby they bound their successors or heirs, executors, administrators and assigns, jointly and severally, in the amount of said sum, as more fully described in the annexed "Schedule C," said schedule being a copy of the bond(s) or note(s), or accurate reference to the assumption agreement(s) evidencing indebtedness to plaintiff, together with the terms of repayment of said sum and rights of the plaintiff.

FIFTH: Plaintiff is the holder of the Note referenced in paragraph FOURTH and entitled to enforce the Note. The Note was payable to Plaintiff or indorsed (specifically or in blank) and negotiated to Plaintiff. A copy of the Note with the indorsement(s) and/or allonge(s) is annexed hereto as Schedule "C".

SIXTH: That as security for the payment of said indebtedness, a Mortgage(s) was executed as annexed hereto in "Schedule D," acknowledged and delivered to the stated Lender/Mortgagee, its successors and assigns, wherein the named mortgagor or mortgagors bargained, granted and sold to the mortgagee named therein, its successors and assigns, the premises more particularly described therein (hereinafter, the "Mortgaged Premises") under certain conditions with rights, duties and privileges between the parties as described therein.

SEVENTH: The Mortgage is currently held by Plaintiff. As such, Plaintiff is current beneficiary of the Mortgage securing the Note, the originals of which are in Plaintiff's possession and control, and Plaintiff is otherwise entitled to enforce the subject Mortgage and Note pursuant to law.

EIGHTH: That said mortgage(s) was duly recorded and the mortgage tax(es) due

thereon was duly paid in the County Clerk's Office at the place and time that appears therein.

NINTH: That Plaintiff has complied with all applicable provisions of the RPAPL Section 1304 and Banking Law, and specifically with Banking Law § 595-a and 6-l and 6-m if applicable, in securing the aforementioned indebtedness and at all times thereafter. In accordance with RPAPL Section 1304, a 90 day notice was sent to the borrower at least 90 days ago but within the last 12 months. The 90 day notice was sent at least 90 days before the commencement of this foreclosure action. Further, the notice under RPAPL Section 1304 was in 14-point type, contained the statutorily dictated language and the addresses and phone numbers of at least five US Department of Housing and Urban Development approved housing counseling agencies in the region where the borrower resides and was mailed by registered or certified mail and first class mail to the last known address of the borrower. Plaintiff has fully and completely complied with the RPAPL Section 1304. Further, Plaintiff has complied fully with RPAPL Section 1306 filing requirements in that the filing with the superintendent was completed within three (3) business days of the mailing.

TENTH: That the defendant(s), DEBORAH A. BUCZEK A/K/A DEBORAH ANN GALE BUCZEK A/K/A DEBORAH ANN GALL BUCZEK A/K/A DEBORAH GALL BUCZEK, has failed to comply with the conditions of the mortgage(s) or bond(s) by failing to pay portions of principal, interest or taxes, assessments, water rates, insurance premiums, escrow and/or other charges, all as more fully described in "Schedule E".

ELEVENTH: That plaintiff elects herein to call due the entire amount secured by the mortgage(s) as more than thirty (30) days have elapsed since the date of default.

TWELFTH: That "Schedule E" sets forth the principal balance due and the date and rate from which interest accrued and is owing from the defendant(s) default.

THIRTEENTH: That in order to protect its security, the plaintiff has paid, if set forth in

"Schedule E", or may be compelled to pay during the pendency of this action, local taxes, assessments, water rates, insurance premiums and other charges assessed to the Mortgaged Premises, and hereby requests that any sums paid by it for said purposes, with interest thereon, be added to the sum otherwise due, be deemed secured by the mortgage(s) and be adjudged a valid lien on the Mortgaged Premises.

FOURTEENTH:   That the defendants herein have or claim to have some interest in, or lien upon, the Mortgaged Premises or some part thereof, which interest or lien, if any, accrued subsequent to the lien of the plaintiff's mortgage(s).

FIFTEENTH:   That the plaintiff is now the true and lawful holder of the said bond(s)/note(s) and is mortgagee of record or has been delegated the authority to institute a mortgage foreclosure action by the owner and holder of the subject mortgage and note; and there have been no prior proceedings, at law or otherwise, to collect or enforce the bond(s)/note(s) or mortgage(s) and no such proceedings are currently pending.

SIXTEENTH:   That Schedules "A", "B", "C", "D" and "E", be incorporated and made part of the Complaint with the same force and effect as if they were completely and fully set forth wherever reference is made to them herein.

SEVENTEENTH:   The plaintiff shall not be deemed to have waived, altered, released or changed its election herein by reason of any payment after the commencement of this action of any or all of the defaults mentioned herein and such election shall continue to be effective.

WHEREFORE, plaintiff demands judgment adjudging and decreeing the amounts due it for principal, interest, costs and reasonable attorneys', fees if provided for in the bond(s), note(s) or mortgage(s), and that the defendants, and any persons claiming by, through or under them subsequent to the commencement of this action, and every other person or corporation whose right, title, conveyance or encumbrance of the Mortgaged Premises is subsequent or recorded

subsequent to the plaintiff's interest, be forever barred and foreclosed of all right, claim, lien,

interest or equity of redemption in and to the Mortgaged Premises; that the Mortgaged Premises,

or part thereof, be decreed to be sold according to law as may be necessary to raise the amounts

due for principal, interest, costs, allowances and disbursements, together with any monies

advanced and paid by the plaintiff; that the plaintiff be paid the amounts due on said bond(s),

note(s) and mortgage(s), and any sums paid by the plaintiff to protect the lien of its mortgage(s)

out of the proceeds from the sale thereof, with interest thereon from the respective dates of

payment thereof, costs and expenses of this action and reasonable attorneys' fees, if provided for

in the bond(s), note(s) or mortgage(s), provided the amount of the sale proceeds permits said

payment; that any of the parties hereto may purchase the Mortgaged Premises at sale; that this

Court, if requested, forthwith appoint a Receiver of the rents and profits of the Mortgaged

Premises with the usual powers and duties associated therewith; that the defendants who

executed the Note and were not otherwise released or discharged from bankruptcy be adjudged to

pay any remaining deficiency; and such other or further relief as may be just and equitable, unless

the Defendant obtained a bankruptcy discharge and such other or further relief as may be just and

equitable.  The plaintiff hereby reserves its right to share in surplus monies from the sale by

virtue of its position as a judgment or other lien creditor, excluding the mortgage(s) foreclosed

herein.

DATED: January 7, 2015

Mark K. Broyles, Esq.
FEIN, SUCH & CRANE. LLP
Attorneys for Plaintiff
Office and P.O. Address
28 East Main Street, Suite 1800
Rochester, New York 14614
Telephone: (585) 232-7400
FKNC2913

STATE OF NEW YORK
COUNTY COURT        COUNTY OF ERIE
KEYBANK NATIONAL ASSOCIATION,



COPY

                                Plaintiff,

                                                    CERTIFICATE OF
                                                    MERIT PURSUANT TO
                                                    N.Y. C.P.L.R. §3012-b
                                                    Mortgage Premises Address
-vs-                                                7335 DERBY ROAD
                                                    DERBY, NY 14047

DEBORAH A. BUCZEK A/K/A DEBORAH ANN GALE
BUCZEK A/K/A DEBORAH ANN GALL BUCZEK
A/K/A DEBORAH GALL BUCZEK; NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE CIVIL ENFORCEMENT - BUFFALO DO;
NEW YORK STATE DEPARTMENT OF TAXATION
AND FINANCE CIVIL ENFORCEMENT - REGION 1A;
UNITED STATES OF AMERICA;
"JOHN DOE" AND "JANE DOE" said
names being fictitious, it being the intention of
Plaintiff to designate any and all occupants of premises
being foreclosed herein,
Defendant(s).

    1.    I am an attorney at law duly licensed to practice in the State of New York, and am
affiliated with the law firm of Fein, Such & Crane, L.L.P., attorneys for plaintiff in this
action.

    2.    This residential foreclosure action involves a home loan, as such term is defined in
Real Property Actions and Proceedings Law §1304 to the extent alleged in paragraph NINTH of
the Complaint.

    3.    I have reviewed the facts of this case and reviewed pertinent documents, including
the mortgage, security agreement and note or bond underlying the mortgage executed by
defendant, all instruments of assignment (if any), and all other instruments of indebtedness
including any modification, extension, and consolidation.

    4.    I have consulted with BRANDY BOWMAN, FORECLOSURE SPECIALIST, a
representative of the Plaintiff.

    5.    Upon this review and consultation, to the best of my knowledge, information, and
belief, I certify that there is a reasonable basis for the commencement of this action, and that
plaintiff is the creditor entitled to enforce rights under these documents.

6.      Attached herein and as part of the Complaint are copies of the following documents: the mortgage, security agreement and note or bond underlying the mortgage executed by the defendant; all instruments of assignment (if any); and any other instrument of indebtedness, including any modification, extension, and consolidation.

7.      Attached herein and as part of the Complaint, if applicable, are supplemental affidavits attesting that certain documents as described in paragraph 5 supra are lost, whether by destruction, theft, or otherwise.

8.      I am aware of my obligations under New York Rules of Professional Conduct (22 NYCRR Part 1200) and 22 NYCRR Part 130.

Dated:   1/20/15

Mark K. Broyles, Esq.
FEIN, SUCH & CRANE, LLP
Attorneys for Plaintiff
Office and P.O. Address
28 East Main Street, Suite 1800
Rochester, New York 14614
Telephone: (585) 232-7400

## SCHEDULE "A" - DEFENDANTS

**DEFENDANTS**                                    **CAPACITY**

**Deborah A. Buczek**                             Record Owner and original obligor by virtue of
a/k/a **Deborah Ann Gale Buczek**                the Note/Bond secured by the Mortgage recorded
a/k/a **Deborah Ann Gall Buczek**                on October 21, 2008, in Liber 13423, at
a/k/a **Deborah Gall Buczek**                    Page 9147.
7335 Derby Road
Derby, New York 14047


**John and Mary Doe**                            Said names being fictitious, it being the
                                                 intention of Plaintiff to designate any and
                                                 all occupants, tenants, persons or
                                                 corporations, if any, having or claiming an
                                                 interest in or lien upon the premises, being
                                                 foreclosed herein.

## SCHEDULE "B"

**New York State Department of Taxation and Finance**
**Civil Enforcement – Buffalo DO**
77 Broadway – Suite 112
Buffalo, New York 14203-1670

Possible Subordinate Lienor by virtue of New York State Tax Warrant in Erie County for $34,205.79 against Daniel R. Buczek and/or Deborah A. Buczek, 7335 Derby Road, Derby, New York 14047-9636, dated May 22, 2010, and recorded June 25, 2010, in Warrant ID No. E-009592889-W004-6.

**New York State Department of Taxation and Finance**
**Civil Enforcement – Region 1A**
W.A. Harriman Campus
Albany, New York 12227-0001

Possible Subordinate Lienor by virtue of New York State Tax Warrant in Erie County for $11,613.39 against Deborah A. Buczek and/or Daniel R. Buczek, 7335 Derby Road, Derby, New York 14047-9636, dated April 30, 2011, and recorded June 2, 2011, in Warrant ID No. E-109592889-W009-6.

**United States of America**
**O/B/O Internal Revenue Service**

Possible Subordinate Lienor by virtue of Federal Tax Lien filed in Erie County Clerk's Office in the amount of $26,800.34 under Serial Number 969089813, Area: Small Business/Self Employed, Area #1 against Daniel R. & Deborah A. Buczek, PO Box 93, Derby, New York 14047, Dated November 14, 2013, and Filed December 23, 2013, in Liber 266, at Page 9214.

--------------------------------------

Possible Subordinate Lienor by virtue of Federal Tax Lien filed in Erie County Clerk's Office in the amount of $93,418.14 under Serial Number 974516713, Area: Small Business/Self Employed, Area #1 against Daniel R. & Deborah A. Buczek, PO Box 93, Derby, New York 14047, Dated December 18, 2013, and Filed January 14, 2014, in Liber 267, at Page 5184.

--------------------------------------

Possible Subordinate Lienor by virtue of Federal Tax Lien filed in Erie County

Clerk's Office in the amount of $21,713.84 under Serial Number 100659514, Area: Small Business/Self Employed, Area #1 against Deborah A. Buczek, PO Box 93, Derby, New York 14047, Dated May 19, 2014, and Filed June 2, 2014, in Liber 271, at Page 214.

**SCHEDULE "C"**


**KeyBank**

## KEY EQUITY OPTIONS AGREEMENT

**Meaning of Words:** In this Agreement the words "we" "us" and "our" mean KeyBank National Association ("KeyBank") 4910 Tiedeman Road, Suite C, Brooklyn, OH 44144   The words "you" and "your" mean jointly and severally

DEBORAH A. BUCZEK _____

7335 DERBY RD    DERBY, NY 14047
(Borrower(s) Name(s) and Residence) and the word "Agreement" means this Key Equity Options Agreement

**Terms of Agreement:** This Agreement governs the use of your Key Equity Options line of credit account (the "Account") with us   It describes your variable rate, open-end, revolving line of credit with us (the "Variable Rate Portion") and the Fixed Rate Option by which you may elect to repay certain advances against your line ("Line") of credit at a fixed interest rate for a specified term

**1. KEY EQUITY OPTIONS AGREEMENT**
**1. Credit Limit:** An approved Line of $ 50,000.00 ___ ("Credit Limit") is established for your Key Equity Options Account   During the draw period, you may obtain advances ("Advance"), repay and then obtain additional Advances, provided such Advances would not cause your Credit Limit to be exceeded. Your Credit Limit will be reduced by Advances taken against your Account and by the amount of any Fixed Rate Option(s) which you elect to take   During the draw period, any amount(s) you repay against the outstanding principal balance of the Variable Rate Portion or any Fixed Rate Option will increase the amount of credit available to you accordingly. During the repayment period, you will no longer be entitled to obtain Advances. You agree not to request an Advance which would cause the total of Advances outstanding, together with all other sums owed under this Agreement (including finance charges and other charges), to exceed the Credit Limit   You further agree not to use any such Advances for any purpose expressly prohibited in any Rider to this Agreement which is incorporated into this Agreement.

**2. Access to Your Account:** You may obtain and direct Advances from your Account, up to your Credit Limit, as follows
   **A. Cash Advance** You may request a Cash Advance in person at designated branches during normal business hours,
   **B. Telephone Transfer** You may request an Advance from us if you have a deposit account with us and have been approved for telephone transfers, by making a telephone transfer request for a specified sum to be advanced under your Account and deposited in a deposit account that is maintained with us  In order to access your Account by telephone transfer you must maintain one or more eligible deposit accounts with us throughout the term of this Agreement, including the terms of any Fixed Rate Option. No separate minimum balance or usage requirements for those deposit accounts are imposed under this Agreement;
   **C. Overdrafts-Linked Account (NOT AVAILABLE IN CONNECTICUT AND NEW YORK)** If you have a demand deposit account with us that is linked to your Account, you may access your Account by an overdraft of that linked deposit account (the "Linked Account") up to the amount of your Credit Limit. Only one deposit account may be linked to your Account for the overdraft protection
      The linking of a deposit account to your Account is optional, but you will not enjoy any overdraft privileges unless you do link a deposit account to your Account.  If the Linked Account becomes overdrawn, funds will automatically be transferred to the Linked Account in an amount sufficient to cover the overdraft.  Overdrafts of the Linked Account will be covered up to the amount of your available Credit Limit whether the overdraft occurs through charges or other debits to the Linked Account or your accessing the Linked Account. The person(s) who signed the Agreement as Borrower(s) must also be the same and only person(s) who are identified as owners of the Linked Account;
   ☐ If this box is checked, you elect to use your Key Equity Options Account as overdraft protection on your KeyBank Checking Account Number _____ ; and
      **D. KeyEquity Card. (THE KEYEQUITY CARD IS NOT AVAILABLE IN CONNECTICUT OR NEW YORK)**  You will be issued and agree to accept a KeyEquity Card credit card.  All transactions you make with the Key Equity Card will be treated as an Advance and posted to your Account as of the date of the transaction, and
      **E. Equity Line Checks.** Your Account may be accessed by special Equity Line Checks ("Checks") provided by us. You will receive these Checks imprinted with your Account number.  The amount of each Check will be treated as an Advance and posted to your Account.

**3. Promise to Pay:** You promise to pay all amounts outstanding on your Account, including any fees and charges we impose.  If more than one person signs this Agreement, you agree that (i) we can enforce our rights against each of you individually or against all of you together and (ii) we can send Account statements, notices and any other correspondence to either of you.

**4. Security:** You are giving us the right of setoff and a mortgage/deed of trust security interest on your Residence or the real estate located at 7335 DERBY RD    DERBY, NY 14047 _____ ("Property") (Address if different than above)  You agree to execute a mortgage or deed of trust ("Security Instrument") giving us a security interest in this real estate  All Advances up to the Credit Limit, which we are obligated to make under this Agreement, will be secured by the liens described in the Security Instrument, you will not permit, create or allow any other encumbrance or lien on this real estate without our prior written consent  We will consider any default by you under the Security Instrument a default in the material obligations under this Agreement. You could lose your Property if you don't meet the obligations in your Agreement with us   Other property held by us as

UN_KBNA KEOP/KEOH Agreement                          Page 1                Line #
Rev 09/2008                                                                 ACAPS #

## KEY EQUITY OPTIONS AGREEMENT

collateral securing other loans (unless the other property is the principal residence of any person having an ownership interest in that property) may also secure your Account.

5. **Key Protect:** You are not required to obtain accidental loss of life, natural loss of life or accidental disability debt cancellation protection (collectively referred to as "debt cancellation protection") as a condition of obtaining credit under this Agreement. If we have offered you debt cancellation protection and you have elected to purchase it from us, you authorize us to add the cost of the debt cancellation protection fee to your Account each monthly billing cycle. If you want this optional protection, you must complete a separate application. We may allow you to exceed the Credit Limit temporarily from time to time to accommodate these debt cancellation fee amounts and you may be charged an Over Limit fee. The amount of debt cancellation protection available for purchase may not be sufficient to cover the entire outstanding balance of your Account.

6. **Term/Minimum Monthly Payment:** *Draw Period.* The length of the Draw Period during which you can obtain Advances against your Account is Twenty (20) _____ years ( 240 ____ months ) During the Draw Period, payments are due monthly You agree that during the Draw Period you will make payments equal to the minimum payment for both the Variable Rate Portion and any Fixed Rate Option(s) ("Minimum Monthly Payment"). In addition to the required minimum payment for both the Variable Rate Portion and any Fixed Rate Option(s), your Minimum Monthly Payment will also include any past due amounts, and any fees, charges or debt cancellation fees. The Minimum Monthly Payment may not fully repay the principal outstanding on your Account.

You are required to pay us immediately all amounts exceeding your Credit Limit. The amount of your payment may change because the Annual Percentage Rate ("APR") is variable on the Variable Rate Portion. You promise to pay us the unpaid balance of Advances plus the Finance Charges, calculated at the daily periodic rate, and any additional charges permitted by this Agreement. Rate information will be provided on the monthly statements that we send you

**A. Variable Rate Portion:** Required Minimum Payment (Select one of the following payment options.)

☐ Interest Only — An amount equal to accrued Finance Charges. (Not available in Connecticut.)

☒ Regular Payment — An amount equal to the greater of (a) 1/240th of the unpaid balance of Advances plus accrued Finance Charges or (b) $100.00, and all previously billed but unpaid minimum payments to your Account. Balances of less than $100.00 must be paid in full.

**B. Fixed Rate Option:** You agree to repay any Fixed Rate Option ("Option") in consecutive, substantially equal monthly payments at the interest rate, for the term, and with such other conditions as agreed upon at the time you exercise the Option. The monthly payment due on any Option will be an amount of principal and interest sufficient to amortize the Option over the term selected by you at the time the Option is exercised. This payment will be in addition to and combined with the required minimum payment due for your Variable Rate Portion as described in the Agreement. Disclosure of the required minimum payment due on the Option will be based on an estimated disbursement date.

If at the time that the Variable Rate Portion of your Account matures you still owe money under the terms of any Option(s), you shall continue to make payments on such Option(s) according to the terms and conditions of the Option confirmation notice(s) (which are incorporated into this Agreement by reference) and according to this Agreement

7. **Term/Minimum Monthly Payment:** *Repayment Period.* The Repayment Period begins the first day after the Draw Period ends and continues for Fifteen (15) _____ years ( 180 ____ months ) After the Draw Period ends, you will not be able to obtain any more Advances or exercise any Options and you will begin to repay the outstanding balance on your Variable Rate Portion by making consecutive monthly payments. During the Repayment Period, payments will be due monthly Your monthly payment for the Variable Rate Portion will be computed, at the beginning of the Repayment Period and each year thereafter, to yield the monthly payment amount necessary to fully amortize the outstanding balance, together with Finance Charges, over the remaining term at the then current APR. There will be a minimum payment of $100 for the Variable Rate Portion during the Repayment Period and if your principal balance is less than $100, the full amount will be due If the accrued Finance Charges for any given billing period on the Variable Rate Portion exceed the monthly payment for that same billing period, your monthly payment will be equal to the accrued Finance Charges for that billing period. The Minimum Monthly Payment due on your Account during the Repayment Period will include any monthly payment due on your Variable Rate Portion, any monthly payments due on your Option(s), any past due amounts, any fees charged to your Account, and any debt cancellation fees.

8. **Variable Rate Portion.** Prime Rate Index: You must pay a Finance Charge on all Advances from the date each Advance is made until we receive payment in full The Finance Charge is figured separately for both the Variable Rate Portion and any Fixed Rate Option(s) The Index used by us to determine the Finance Charge for the Variable Rate Portion is the "Prime Rate" as published in the Wall Street Journal "Money Rates" table ("Index"). The Index is published in each edition of the Wall Street Journal Where more than one Prime Rate is published in any edition, the Index will be the highest of the Prime Rates set forth The Prime Rate is just a pricing index and is not necessarily the lowest rate charged by us or any other lender If the Index becomes unavailable for whatever reason, we will choose another Index which is also readily available and verifiable by you and which is beyond our control We will notify you of the substitute or replacement Index. We may also change the margin if the Index becomes unavailable. The selection of any replacement Index and margin will be done in compliance with applicable law

9. **Fixed Rate Option.** Fannie Mae Index: You must pay a Finance Charge on the Option from the date you exercise the Option until we receive payment in full The index used by us to determine the Finance Charge for the Option(s) is equal to Fannie Mae's required net yield, as of the business day prior to the date that you exercise the Option, for 30-year fixed rate mortgages covered by applicable 30-day mandatory delivery commitments as published in the Wall Street Journal "Money

UN_KBNA KEOP/KEOH Agreement  Page 2  Line #
Rev 09/2008    ACAPS # 

## KEY EQUITY OPTIONS AGREEMENT

e ("FRO Index"). The FRO Index is published in each edition of the Wall Street Journal. If the FRO Index
unavailable for whatever reason prior to the date you exercise an Option, we will chose another FRO Index which
adily available and verifiable by you and which is beyond our control. We will notify you of the substitute or
nt FRO Index. We may also change the margin(s) disclosed below if the FRO Index becomes unavailable. The
selection of any replacement FRO Index and Margin(s) will be done in compliance with applicable law.

10.  **Maximum Annual Percentage Rate:** Your maximum APR is 18.0%, which is a Daily Periodic Rate of .049315%
( .049180% in a leap year)  Your APR may change by any amount on any Change Date not to exceed the maximum APR.

11.  **Minimum Annual Percentage Rate:** Your minimum APR is 3.49%, which is a Daily Periodic Rate of .009561%
(.009536% in a leap year)  Your APR may change by any amount on any Change Date, but will not be less than the
minimum APR.

12.  **Variable Annual Percentage Rate:** *Variable Rate Portion* The APR on your Account has a variable rate feature  The APR and
the minimum payment can change as a result. The APR is based on the value of the index ("Index") described above. To
determine the APR that applies to your Account we ☒ add ☐ subtract a Margin of 1.10   % to the value of the Index
The APR does not include costs other than interest  The APR on your Account may change daily  If the Index increases in
value (assuming the same outstanding balance), the APR and minimum payment will also increase  If the Index decreases
in value (assuming the same outstanding balance) the APR and minimum payment may decrease, but the minimum
payment during the Draw Period will always be at least the accrued Finance Charges, if you chose the interest only payment
option, or the lesser of $100 or the outstanding balance, if you chose the principal plus interest payment option.  During the
Repayment Period, the minimum payment will always be at least the lesser of $100 or the outstanding balance  If the Daily
Periodic Rate increases, a lesser portion of your minimum payment may be applied to principal and a greater portion will be
applied to Finance Charge  The APR does not take into account your optional Linked Account.

The date on which your APR could change is called "Change Date"

13.  **Finance Charge:** *Variable Rate Portion*  We figure the daily Finance Charges on your Account by multiplying the
Daily Balance by the Daily Periodic Rate then in effect. Then we add all of the daily Finance Charges together to get the
total accrued Finance Charge for the billing cycle. The Daily Balance is figured this way  we take the beginning principal
balance (which excludes unpaid Finance Charges [except for financed closing costs, if any]), each day and add to it any new
debit amounts (each of which is posted as of the effective date of the transactions).  The principal balance includes the
amount of the Advance and any other items that are financed, such as closing costs, if any  Next we subtract payments and
credits posted to the Account's principal balance (each of which is posted as of the effective date of the transaction)  This
gives us your Daily Balance.  (For purposes of figuring the Daily Balance, we will not subtract any payment or portion
thereof, that is in excess of the principal balance  For each day there is a balance in excess of the principal balance ("credit
balance"), we will use zero in place of the credit balance)  We determine a daily periodic rate by dividing the "Annual
Percentage Rate" by the number of days in a year (365 or 366)  Your periodic rates may vary.
        The Finance Charge does not include costs other than interest.  The Finance Charge does not take into account
your optional Linked Account. Payment in full of the new balance by the due date will not avoid the assessment of Finance
Charges on the balances from the date shown on your monthly statement through the date paid  Finance Charges begin to
accrue as of the effective date of the Advance or charge  There is no grace period.

14.  **Initial Disclosure:** *Variable Rate Portion.*

☒      If this box is checked, the APR as of 10/05/08   is 6.10   %, which is a Daily Periodic Rate of
0.01666667   %  This rate may change daily.

The initial APR is based on the Index and margin used for later rate adjustments.

A.  **Promotional Rate Discount**

☐      If this box is checked, the initial APR is n/a   %, which results in a Daily Periodic Rate of
n/a   %  The initial APR is "discounted"  This initial APR is based on the Index ☐ plus ☐ minus a
margin of n/a %       The initial index plus/minus a margin will remain in effect through
n/a             After the discounted period, the APR that will apply is the Index then in effect ☐ plus
☐ minus a margin of n/a   % which, as of n/a   , is n/a   % APR and a Daily Periodic Rate of
n/a   %

The initial APR is not based on the margin used for later rate adjustments.

☐      If this box is checked, you must agree to take a minimum initial advance of n/a   at the time the Account
is opened in order to obtain the promotional rate discount. We reserve the right to apply the initial,
non-discounted rate to the Account if the required minimum initial advance is not taken.

☐      If this box is checked, you must have, or agree to open, a deposit account with us in order to obtain the
promotional rate discount  We reserve the right to apply the initial, non-discounted rate to the Account if you do
not have the required deposit account.

15.  **Nature of a Fixed Rate Option:** During the Draw Period, you may use the Fixed Rate Option to convert amounts you
owe under the Variable Rate Portion of your Account from a variable to a fixed rate of interest  An Option will have a fixed
interest rate and specified term, and allows you to repay a specified amount in substantially equal consecutive monthly
payments that will be in addition to and combined with any minimum payment on your Variable Rate Portion. An Option

UN_KBNA KEOP/KEOH Agreement                    Page 3                    Line
Rev. 09/2008                                                            ACAPS

## KEY EQUITY OPTIONS AGREEMENT

may be for any amount between $5,000 and the amount of the credit remaining on the Variable Rate Portion of your Account. If there is an Option outstanding, your Account will consist of a Variable Rate Portion (reflecting the Advance(s) against the Line) and an Option portion (reflecting the Advances(s) against the Line which you have elected to repay at a fixed rate over a specified term). Your monthly statement will reflect both portions of your Account. You may choose a term between 12 and 180 months. The term of the Option may extend beyond the maturity of the Variable Rate Portion of your Account.

**16. Conditions for Exercising a Fixed Rate Option:** You may exercise an Option if a) you are in the Draw Period; b) no default exists under the terms of the Agreement; c) there are not more than three Fixed Rate Options outstanding after you exercise the Option, d) you have not exercised more than two Options within the previous 365 day period, and e) you sign any request forms that may be required by us to confirm your decision to exercise the Option. In no case may you exceed your Credit Limit by exercising the Option.

**17. Exercising the Fixed Rate Option:** To exercise the Fixed Rate Option call 1-800-KEY2YOU at such times or locations as we tell you.

**18. Finance Charge:** *Fixed Rate Option.* The Finance Charge on the Fixed Rate Option Portion of your Account is made up of the sum of two components as follows   A   The first component is calculated by multiplying the Daily Balance for each day by the Daily Periodic Rate then in effect.  (The Daily Periodic rate is determined by taking the FRO Index in effect, adding the appropriate Margin as described below, and dividing by the number of days in the year (365 or 366).) Then we add all of the daily Finance Charges together to get the total accrued Finance Charge for the statement cycle.  B. The second component is the Fixed Rate Option Fee, whether financed or separately paid.  (Finance Charge = A+B)  The Daily Balance is figured this way we take the beginning principal balance (which excludes unpaid Finance Charges [except for any financed Fixed Rate Option fee]) and certain other charges, if any. The principal balance includes the amount of the Option and any other items that are financed, such as the Fixed Rate Option fee, if any.  Next we subtract any payments and credits posted to the Account's principal balance (each of which is posted as of the effective date of the transaction)  This gives us your Daily Balance.

**19. Initial Disclosures:** *Fixed Rate Option.* To the FRO Index value we will add a Margin of  1.010  % for Options between 12 and 60 months,  1.260  % for Options of more than 60 months to 120 months, and  2.010  % for Options of more than 120 and 180 months  As of  10/06/08  , the Daily Periodic Rate for an Option of 12 to 60 months is  0.018742317  %  This is an APR of  6.860  %  As of  10/06/08  , the Daily Periodic Rate for an Option of more than 60 to 120 months is  0.019942623  %  This is an APR of  7.110  %  As of  10/06/08  , the Daily Periodic Rate for an Option of more than 120 to 180 months is  0.02247543  %  This is an APR of  7.860  %  Once an Option has been established, the Daily Periodic Rate for that Option will not change  However, if the Daily Periodic Rate quoted to you for an Option changes before you exercise the Option, the corresponding minimum payment and APR may be different than the one quoted to you  An increase in the Daily Periodic Rate may increase the minimum payment  Notwithstanding any other provision in this Agreement, we do not intend the interest we charge to exceed the maximum rate allowed under applicable law  The APR (shown here) does not include costs other than interest  Finance Charges begin to accrue as of the effective date your Advance is converted to an Option.

   **A.   Promotional Rates**  We may, in our discretion, offer a promotional rate from time to time to apply to any Option that meets the criteria for the promotional offer and is exercised during the promotional period.  If we, in our discretion, choose to offer a promotional rate, the rate will be based on the FRO Index and will be equal to either the FRO Index, the FRO Index plus a reduced Margin, or the FRO Index minus a Margin.  Any promotional rate offered will be set by us but will never exceed the rate determined by adding the Margin, stated above, to the FRO Index.  We will tell you the FRO Index and Margin, if any, that will apply to your Option at the time you exercise the Option.

**20. Fixed Rate Option Fee; Finance Charge:**  You will pay a Fixed Rate Option fee of  $50.00   when you elect to exercise an Option  The APR shown on your monthly statement may increase for the month in which the fee is imposed. It may exceed the maximum APR shown above because it includes costs other than interest.  This is the second component of the Finance Charge.

**21. Annual Membership Fee:**  Your Key Equity Options Account may be charged an annual membership fee of  $0.00 during the Draw Period whether or not you use the Account.  If a membership fee is charged, the membership fee will be charged to your Account upon signing the Agreement and will automatically be charged to your Account annually in the month of the anniversary date of the opening of your Account. The membership fee is non-refundable and you will owe it once it is charged to your Account whether or not your Account is subsequently changed, suspended or terminated for any reason

☐ If this box is checked, the Annual Membership Fee is waived for the first year

**22. Other Fees:**  In addition to the Annual Fee, Fixed Rate Option Fee, and Closing Costs described in this Agreement, we charge the following fees.

   (a) **Late Fee**  We charge a late fee if we do not receive at least the Minimum Monthly Payment within ten (10) days after the payment due date, as stated on your monthly statement. The late fee for each late Payment will be ten percent (10%) of the Minimum Monthly Payment amount, not to exceed $30.00

   (b) **Returned Item Fee**  We may charge a returned item fee if any check or other instrument given for payment on the Account is dishonored for any reason  The returned item fee may be $20.00

   (c) **Overline Fee**  In the event you incur charges in amounts exceeding your Credit Limit, an overline fee in the amount of $20.00 may be charged for each instance where your Credit Limit is exceeded.

   (d) **Check Stop Payment Fee**  A fee of $20.00 may be charged in connection with each Check stop payment order placed by you. A Check Stop Payment Fee is not charged if your Account was opened in Indiana or Maine.



## KEY EQUITY OPTIONS AGREEMENT

(e) KeyEquity Card Replacement Charge.  A fee of $10.00 may be charged to replace a KeyEquity Card for any reason.

(f) Discharge Fee.  When we discharge or otherwise release the Security Instrument, you will be charged a fee for recording the discharge or satisfaction subject to any limitations applicable law imposes  Based upon current costs, we estimate the fee to be $ 43.50 .

You also agree to pay, if applicable law permits and subject to any limitations applicable law imposes, all costs we incur in collecting amounts owed under this Agreement or in enforcing or defending our rights under this Agreement  These costs may include collection agency fees, attorneys' fees, (which may exceed two percent (2%) of the total principal, interest and costs due), filing fees and court costs

The above fees will be added to the Maximum Monthly Payment due

**23. Additional Charges:**  You agree to pay the following charges

| | | | | |
|---|---|---|---|---|
| (a) Filing Fees | $ 0.00 | (f) Flood Hazard Determination | $ 0.00 |
| (b) Title Search/Title Insurance | $ 0.00 | (g) Life of Loan Flood Tracking | $ 0.00 |
| (c) Property Appraisal | $ 0.00 | (h) Mortgage Tax | $ 0.00 |
| (d) Credit Report | $ 0.00 | (i) Closing Agent Fee | $ 0.00 |
| (e) Notary | $ | (j) | $ 0.00 |
| | | TOTAL | $ 0.00 |

**24. Account Termination Fees:**  If you voluntarily terminate this Agreement at any time prior to three (3) years from the date hereof, we charge and you agree to pay us a termination fee of $ 450.00

**25. Insurance:**  In connection with the Security Instrument, we require fire and extended Property insurance in an amount equal to all liens on the Property described in the Security Instrument with a mortgagee payable clause in our favor.  In addition, we require flood insurance, if applicable, as described in the Security Instrument.  Your failure to meet this requirement will constitute an inaction by you that adversely affects our security thereby creating an event of default.  This Property insurance will not be provided nor financed by us but may be obtained by you through any insurer acceptable to us.  You will deliver to us copies of the insurance policy or policies or a certificate of insurance within thirty (30) days of the date of this Agreement.  If you fail to do so or fail to pay the insurance premiums, we may obtain the insurance covering our interest.  If we do this, any such amounts shall be assessed to your Account as Advances which will reduce the amount of available credit and you agree to pay such additional Advances.   Such amounts may not be covered by the Security Instrument you have granted to us

**26. Reappraisal:**  You agree that we have the right to inspect and reappraise any Property which secures Advances made under this Agreement, for as long as the Agreement is in effect or as long as any balance owed under the Agreement is still outstanding  If requested, you will give us permission to enter your dwelling and other Property to inspect and reappraise.  We will conduct our inspection upon reasonable notice and at reasonable times.  We may charge your Account for any costs that we incur in obtaining any reappraisal or in the appraisal review process, even if performed by our employees, up to a maximum of $ 400.00

**27. Liability:**  We have no responsibility for the refusal of any merchants, banks or others to honor the KeyEquity Card and Checks or for any goods or services purchased through the use of your Account.

**28. Events of Default:**  The entire Account balance including  any amount owing on the Variable Rate Portion and all Fixed Rate Options will, at our option, become immediately due and payable, after any notice to you required by applicable law, in the event that (a) you fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is any fraud or misrepresentation by you at any time in connection with this Account or (c) any action or inaction by you adversely affects our security or any of our rights in such security  Any action or inaction by you which adversely affects our security, includes, but is not limited to, transfer of title to the Property, sale of the Property without our prior written consent, failure to maintain required insurance on the Property, commission of waste or destructive use of the Property, failure to maintain the Property such that it adversely affects our security, failure to pay taxes on the Property or other action which results in the filing of a senior lien on the Property, your death (in the state of Connecticut, the death of all Borrowers who signed this Agreement), the taking of the Property through eminent domain or illegal use of the Property.  (If your Account is secured by a junior or secondary lien on property located in Connecticut and you have paid loan fees, points or similar prepaid finance charges, then any amount owing under this Agreement will, at our option, become immediately due and payable, without notice to you, if a required payment for any outstanding balance is more than sixty (60) days late or any other event described above occurs.)

Our failure to immediately and permanently terminate the Account or accelerate payment or take other permitted actions set forth above shall not prohibit us from taking such action at a later time, as long as the condition still exists at that time.  We may prohibit additional Advances or reduce your Credit Limit in the event that (a) the value of the dwelling that secures the Account declines significantly below the Property's appraised value for purposes of the Account  For purposes of this paragraph, a decline in value shall be significant if the value of the dwelling declines such that the initial difference between the Credit Limit and the available equity (based on the Property's appraised value for purposes of the Agreement) is reduced by fifty percent (50%) or more.  For example, assume a house with a first mortgage/deed of trust of $50,000 appraised at $100,000 and the credit limit is $30,000  The difference between the credit limit and the available equity is $20,000 ($50,000 - $30,000)  If the Property value declines from $100,000 to $90,000, we could prohibit further Advances, (b) we reasonably believe you will be unable to fulfill the repayment obligations under this Agreement due to a material change in your financial circumstances, (c) you are in default of any material obligations under this Agreement; (d) we are precluded by government action from imposing the APR provided for in the Agreement, (e) the priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than 120% of

UN_KBNA KEOP/KEOH Agreement                Page 5
Rev 09/2008

Line _____
ACAPS 

## KEY EQUITY OPTIONS AGREEMENT

the Credit Limit, (f) we are notified by our regulatory agency that continued Advances constitute an unsafe or unsound practice; or (g) the maximum APR is reached.

In order to reinstate the Agreement, you must send us a written request to that effect. We will only reinstate the Account if we determine to our satisfaction that the condition or reason which caused us to prohibit Advances or to reduce the Credit Limit either no longer exists or has been corrected. If an appraisal or title report is required to make such determination, we may charge you for any such fee(s), which will be billed to your Account as an Advance and will not exceed $400 00

**29. No Waiver of Rights:** We may accept late payments or partial payments marked "payment in full" without losing any of our rights under this Agreement. The waiver of any of our rights and remedies at any time will not mean that we have given up or lost the right to exercise any of our rights and remedies at any later time. We may delay in enforcing any of our rights and remedies under this Agreement without losing them. Failure by us to assert any of our rights shall not waive such rights. We may also take any collection action allowed by law

**30. KeyEquity Card Access: (THE KEY EQUITY CARD IS NOT AVAILABLE IN CONNECTICUT OR NEW YORK.)** If you received a KeyEquity Card with this Agreement, you may access credit available under the Account by using the KeyEquity Card to make purchases, obtain Advances, or obtain cash from automated teller or cash dispensing machine(s) ("Terminal"), subject to the following restrictions.

    **A.** If we issue a personal Identification number ("PIN") to you, you may use the KeyEquity Card at a Terminal identified by a service mark appearing on the KeyEquity Card to obtain cash advances only, subject to the limits on amount and frequency, and payment of any surcharge, imposed by the Terminal owner/operator from time to time

    **B.** You may be liable for the unauthorized use of the KeyEquity Card. You agree to notify us promptly, orally or in writing, if the KeyEquity Card is lost or stolen You may notify us by writing to. Card Service Center, P. O Box 810012, Toledo, Ohio 43081, or by calling us at 1-800-KEY2YOU (1-800-539-2968). We may charge a fee to replace your KeyEquity Card. Your KeyEquity Card is a credit card, and your liability for unauthorized use of the KeyEquity Card will be limited to the amount of money, property, labor or services obtained by unauthorized use before you notify us, up to a maximum of $50 00 Your liability may be reduced under a network rule of MasterCard International Inc. This rule currently provides that a Cardholder's liability for unauthorized use of a MasterCard-branded credit card or debit card issued by KeyBank may be reduced to zero dollars ($0) if (a) the cardholder (i) has reported to KeyBank the loss or theft of the MasterCard-branded credit card within twenty-four hours of the Cardholder's discovery of such loss or theft, (ii) has exercised reasonable care in safeguarding the Card from risk of loss or theft, and (iii) has not reported two or more incidents of unauthorized use in the immediately preceding twelve-month period, and (b) the Cardholder's account (to which Card transactions are posted) is in good standing. Under this rule, "unauthorized use" means use of this Card by a person, other than the Cardholder, who does not have actual, implied, or apparent authority for such use, and from which the Cardholder receives no benefit. This rule does not apply to a Card issued (i) to an entity other than a natural person, (ii) primarily for business, commercial, or agricultural purposes, or (iii) outside the U S A.

    **C.** You agree not to assert us any claims or defenses you may have against any person who honors the KeyEquity Card which arise out of an unresolved dispute as to Property or services rented or purchased with the KeyEquity Card in any credit card transaction (as that term is defined in Federal Reserve Board Regulation Z), unless all of the following conditions are met. (1) the claim is not a tort claim, (2) you have made a good faith attempt to resolve the dispute with the person who honored the KeyEquity Card, (3) the amount of the credit extended to obtain the property or services that resulted in the claim or defense exceeds $50.00, and (4) the purchase or rental transaction occurred in the same state as your current designated mailing address or, if not within the same state, within one hundred miles of that address You hereby agree transactions made by telephone use of a KeyEquity Card will be deemed to have occurred at the merchant's sales location rather than at your mailing address or the location of the telephone used to make the phone call. You further agree not to assert against us any claim based on anyone's refusal to honor the KeyEquity Card.

    **D.** We are not responsible if a merchant, another bank, or a Terminal refuses to honor the KeyEquity Card or transaction Such refusal may also be due to our inability or unwillingness to authorize the transaction for any reason The limits on amount and frequency of transactions that we may authorize may be changed by us, and we may impose other conditions from time to time for security reasons to protect and benefit you. We will not be responsible if authorization for any transaction is not given, and you agree not to assert any claim against us based on any such refusal to honor the KeyEquity Card. Your KeyEquity Card will expire upon the earlier of the expiration date specified on said Card or expiration of the draw period for available credit under the Agreement

    **E.** Use of the KeyEquity Card is subject to all procedures established by us, or by a participating merchant or bank, or owner or operator of a Terminal which honors the KeyEquity Card. We have the right, at our sole discretion, to deny any transaction which would result in an outstanding principal balance in excess of the Credit Limit You agree that any KeyEquity Card(s) issued remain our Property and shall be destroyed by you, or may be retrieved by us or our agent, upon cancellation of the Agreement or cancellation of credit available on the Account.

    **F.** Each credit extension made in connection with any transaction at a merchant or cash advance at a Terminal will be an Advance under the Account and will be repayable by all who have signed or otherwise agreed to this Agreement as a "borrower" You and each other borrower will be jointly and severally liable regardless of how many KeyEquity Card(s) are issued and regardless of whether all applicants receive KeyEquity Cards. If anyone uses your KeyEquity Card with actual, apparent or implied authority, or you benefit from the use of the KeyEquity Card, you will be liable for all Advances extended to or for the benefit of that person.

    **G** We reserve the right, from time to time and without notice to you, to limit, restrict, terminate or otherwise modify the KeyEquity Card access to your Account, as well as the terms and conditions in this Agreement governing such access, as long as we allow you to continue to have the right to obtain cash advances on your Account in those other methods and procedures further described in Agreement and to the extent permitted by applicable law.

**31. Cancellation:** You may close your Account as to future transactions at any time by giving us written notice at the address printed on page one of this Agreement. If we issue you a KeyEquity Card or Checks to obtain Advances, you agree to be liable for all Advances obtained by any person who uses the KeyEquity Card or Checks with your permission If



## KEY EQUITY OPTIONS AGREEMENT

...te your Account or close your Account, you must cut up your KeyEquity Card and return the KeyEquity Card
...s to us. We may cancel your Account pursuant to the terms and conditions of the Agreement set forth above.

...g or cancellation of your Account for whatever reason will not affect your obligations prior to such closing or
...cancellation. The terms of the Agreement shall continue to apply to the outstanding balance on your Account until paid in
full, except that the Repayment Period will commence at the time of closing or cancellation. Use of the Account after
termination or notice of cancellation is fraudulent and you may be subject to legal proceedings.

**32. Tax Deductibility:** You should consult a tax advisor regarding the deductibility of interest and charges under the
Account.

**33. Disclosure of Account Information:** We may share information within the KeyCorp family of companies as well as
with unaffiliated third parties external to Key as described in our Privacy Policy. You specifically consent to us sharing
information within the KeyCorp family of companies and with external unaffiliated third parties. You may elect to
opt out of information sharing as described in our Privacy Policy. If you elect to opt out, that election will override this
consent to share, except for those instances in which we are otherwise permitted to share by law without your consent.

**34. Review of Credit Line:** You agree to provide us with updated financial information including but not limited to
personal financial statements, upon request. This requirement constitutes a material obligation under this Agreement.
Failure to provide any such requested updated financial information to us within thirty (30) days of the request shall
constitute a default under this Agreement. You agree to inform us in writing of any material change in your financial
situation, or any change of your home or mailing address, or if you change your name, within thirty (30) days after such
change. You agree we may, from time to time, obtain an updated credit report on you without first notifying you, or
obtaining your consent.

**35. Stop Payment Procedures:** At your risk and written request, we will, without responsibility on our part so far as we
may lawfully limit our liability, accept a stop payment on your Account. An oral stop payment order is binding for only
fourteen (14) days unless confirmed in writing within that period. No revocation of the request to stop payment shall be
valid unless delivered to us in writing. In order to place a written stop payment request, you must inform us of the exact
amount of the item, the number of the check, the date of the check, your Account number, and any other information
requested. A stop payment request is effective for only six (6) months, unless you renew it. We are not liable for payment
of a check or if a stop payment request has expired and not been renewed, if you have not given us sufficient information or
if your stop payment request comes too late for us to act on it. We are entitled to a reasonable period of time after we
receive your stop payment request to inotify our employees and take other action needed to stop payment. You agree that
"reasonable time" depends on the circumstances but that we will have acted within a reasonable time if we make your stop
payment request effective by the end of the next business day following the business day on which we receive your stop
payment request.

**36. Monthly Statement; Limitation on Time to Report Forgeries and Errors:** We will send you a monthly statement for
each monthly billing cycle when there is a debit or credit balance of more than $1.00 or when a Finance Charge has been
imposed unless your Account is deemed to be uncollectible. The statement will show the number of days in the billing
cycle, the beginning balance and the ending (new) balance. The statement will also show the minimum payment amount,
the payment due date and your available credit. Your Advances, payments, other charges such as annual membership fees
or late charges, or other adjustments will be described as applicable. Any finance charges that you owe will also be shown.
You should review your statements promptly after you receive them. You must notify us as soon as possible if you believe
there is an error, forgery or other problem with the information shown on your Account statement. You agree that fifteen
(15) days after we mailed a statement is a reasonable amount of time for you to review your Account statement and report
any errors, forgeries or other problems. This time limit will not affect any rights you may have under the Electronic Fund
Transfer Act or the Fair Credit Billing Act (see "Your Billing Rights" notice in this Agreement). In addition, you agree not
to assert a claim against us concerning any errors, forgery or other problem relating to a matter shown on an Account
statement unless you notify us of the error, forgery or other problem within sixty (60) days after we mailed you the
statement.

**37. Stop Future Advances:** Each person who signs this Agreement may request us not to permit any additional Advances
under the Account. We may continue to honor requests until we have had reasonable time to act upon your request. You
agree that we do not guarantee that every request for a future Advance will be rejected after your request. Future Advances
may not be obtained until all owners request us in writing to reactivate your Account. If your request is given by telephone,
we may require you to confirm the request in writing. You will hold us harmless from any claim by any party for either
stopping payment on checks or for ceasing to honor requests for Advances. You will resolve any such claims and will
reimburse us for all expenses that we incur in defending any actions or claims brought against us, including reasonable
attorneys' fees, whether or not a lawsuit is commenced.

**38. Giving of Notices:** Any notice that must be given under this Agreement will be delivered or mailed to your address
shown on our records. Any mailed notice will be considered delivered when actually received or on the third business day
after it is mailed, whichever is earlier. Any notice, other than credit card related notices, you send to us is to be sent to the
address shown on your monthly statement, unless we notify you otherwise in writing.

**39. Assignment/Severability Clause:** You cannot assign or transfer your rights or obligations under this Agreement to
another person. Your Account is not assumable. This is a material obligation. If you attempt to assign your rights or
obligations, we can restrict your right to obtain Advances, reduce your Credit Limit, and/or terminate this Agreement and
require you to pay us the outstanding balance in full at once. We may assign or transfer this Agreement and the Security
Instrument to another party without your consent.

UN_KENA KEOP/KEOH Agreement                    Page 7                    Line #
Rev. 09/2008                                                            ACAPS #  

## KEY EQUITY OPTIONS AGREEMENT

If any provision of this Agreement or Security Instrument is held by a court to be invalid or unenforceable, the rest of this Agreement will remain in full force and effect and enforceable according to its terms.

**40.  Taxes, Insurance and Senior Liens:** You promise to pay all senior liens (those recorded before ours), taxes, assessments and other charges on the Property when due.

**41.  Governing Law:** You understand that KeyBank is a national bank with its main office located in Cleveland, Ohio. Consequently, except as provided in the following sentence, this Agreement shall be governed by Federal law and the laws of the State of Ohio, without regard for conflict of law rules. The laws of the state where you opened your Account will apply as provided in Section 103(D)(1) of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, but only to the extent such state laws are not preempted by Federal law or a determination of a discriminatory effect by the Comptroller of the Currency.

**42.  Amendments:** We may amend or modify the terms and conditions of this Agreement in our sole discretion in the following ways at any time upon written notice to you  (1) make specified changes provided for in the Agreement that will occur upon the happening of specified events, (2) change the Index and Margin used under the Agreement if the original Index is no longer available, (3) make a change that will unequivocally benefit you throughout the remainder of the Agreement, including but not limited to extension of the Draw Period, and (4) make insignificant changes, including, but not limited to, changes in balance computation method or payment due date.

**43.  Waiver of Right to Set-Off:** We waive our right to set-off your indebtedness incurred under this Agreement arising solely from use of the KeyEquity Card against any deposit account not specifically pledged to secure the Account and held by us to the extent such right to set-off is prohibited under Regulation Z adopted by the Federal Reserve Board.

**44.  Notice to Alaska Customers:** The undersigned borrower has executed a Deed of Trust to the benefit of KeyBank National Association  Pursuant to Alaska Statute 34.20 160, the undersigned acknowledges and understands as follows

The "Mortgagor or Trustor" (Borrower) is personally obligated and fully liable for the amount due under the Agreement. The "Mortgagee or Beneficiary" (Bank) has the right to sue on the Agreement and obtain a personal judgment against the Mortgagor or Trustor for satisfaction of the amount due under the Agreement, either before or after a judicial foreclosure of the Mortgage or Deed of Trust under AS 09 45 170-09 45 220

As referred to herein, "Mortgagor or Trustor" is the Borrower under the Agreement and Trustor under the Mortgage or Deed of Trust, "Mortgagee or Beneficiary" is KeyBank National Association, its assignee or successor in interest.

**45.  Credit Record:** (Notice for Utah Customers.)  As required by Utah Law, you are hereby notified that a negative credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations

**46.  Your Billing Rights:** This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act. Notify us in case of errors or questions about your bill  If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill  Write to us as soon as possible  We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared  You can telephone us, but doing so will not preserve your rights

In your letter, give us the following information
* Your name and account number
* The dollar amount of the suspected error
* Describe the error and explain, if you can, why you believe there is an error.  If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong.  To stop the payments your letter must reach us three (3) business days before the automatic payment is scheduled to occur

**Your Rights and Our Responsibilities After We Receive Your Written Notice.**
We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then.  Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent.  We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit  You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question
If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount  If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount  In either case, we will send you a statement of the amount you owe and the date that it is due

If you fail to pay the amount that we think you owe, we may report you as delinquent.  However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill  And, we must tell you the name of anyone we reported you to  We must tell anyone we report you to that the matter has been settled between us when it finally is
If we don't follow these rules, we can't collect the first $50 of the questioned amount even if your bill was correct.



## KEV EQUITY OPTIONS AGREEMENT

**Special Rule for Credit Card Purchases.**

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right: (a) you must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address, and (b) the purchase price must have been more than $50.00. These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

**FINAL EXPRESSION** This written Agreement is the final expression of the agreement and understanding of the parties with respect to the general subject matter hereof and supersedes any previous understanding, negotiations or discussions, whether written or oral. This written Agreement may not be contradicted by evidence of any alleged oral agreement.

You agree to be bound by all of the above terms and conditions as set forth in this Agreement and acknowledge receipt of a completed copy of this Agreement.

Borrower: _Deborah A. Buczek_
DEBORAH A. BUCZEK

Borrower: _____

Date: _October 07, 2008_

Date: _____

Borrower: _____

Borrower: _____

Date: _____

Date: _____

---

**VERMONT NOTICE TO COSIGNER**

NOTICE TO COSIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

By signing below, you state that you have read this Note, you have received a copy of this Note for your records, you agree to the terms and conditions of this Note, and you also agree to be absolutely and unconditionally responsible for paying all amounts owed under this Note, in full, whenever such amounts become due, and for otherwise performing all obligations under this Note.

_____
Guarantor Signature

_____
Guarantor Name (Please Print)

---

Agreements secured by Property in the State of Florida only:

STATE OF FLORIDA DOCUMENTARY STAMP TAXES IN THE AMOUNT REQUIRED BY LAW WILL BE PAID UPON THE RECORDING OF THE MORTGAGE SECURING THIS AGREEMENT.

**SCHEDULE "D"**

(2)

State of New York
County Court          County of Erie

---

KEYBANK NATIONAL ASSOCIATION,

              Plaintiff,

-vs-

                                    Index No. 2015600022

DEBORAH A. BUCZEK

              Defendant,

---

## Motion to dismissal for lack of personal jurisdiction, and defective and improper service pursuant to N.Y. CVP. LAW § 306: NY Code - Section 306: Proof of service § 312-a

Comes now Deborah Ann Buczek, the original issue and holder in due course Third Party Plaintiff, by special visitation and not appearing generally, before this court seeking a remedy in Admiralty as is provided by "The Saving to the Suitors Clause" at USC 28 -1333(1). I respectfully request the indulgence of this court as I am not schooled in law. This is provided by the precedent set by Haines vs. Kerner at 404 U.S. 519.

1.)This matter lacks personal jurisdiction means that the papers were not properly served by KeyBank National Association by Mark K. Broyles 28 East Main Street, Suite 1800 Rochester New York at 585-232-7400. The record will show the court lacks jurisdiction over the dispute improper service.

See Exhibit (A) Book Type K Book: 373 Pages: 450

MOTION TO DISMISS FOR IMPROPER SERVICE NOR EXCLAMATION Defect in Service of Process
Dan Buczek is not the Real Party of Interest PROCESS SERVER-Elizabeth Woelfel

2.) There are standards which have been set as for the definition of proper service with respect to notice. I, Deborah Ann Buczek, hereby affirm and declare under penalty of perjury that I did not receive any form of service regarding this Complaint.

3.) Furthermore, there is no evidence whatsoever proving that notice of this hearing was properly served upon me as required by N.Y. CVP. LAW § 306: NY Code - Section 306. "Proof of service shall be in the form of a certificate if the service is made by a sheriff or other authorized public officer, in the form of an affidavit if made by any other person, or in the form of a signed acknowledgement of receipt of a summons and complaint, or summons and notice or Notice of petition as provided for in section 312-a of this article."

4.) There is no evidence of a signature given by myself verifying receipt of this notice, nor is there an affidavit of service attested to by an individual who has claimed to have personally placed this notice in my possession. Email, and Fed Ex deliveries which do not bear signatures, do not constitute proper service and do not satisfy the requirements of the fundamental right to due process of law with respect to this foreclosure.. The lowest standard of proper service requires certified mail return receipt which would contain the signature of the receiving party.

5.) Silence constitutes an implied representation  of the existence of the state of facts in question and will operate as estoppels.  "Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading."

6.) As a result of plaintiff's failure to comply with the service and filing requirements nunc pro tunc, that this matter be dismiss. As a result of these deficiencies, plaintiffs have failed to state a cause of action and the complaint should be dismissed. "Improper/Insufficiency of Service of Process"

**MOTION TO DISMISS FOR IMPROPER SERVICE NOR EXCLAMATION Defect in Service of Process Dan Buczek is not the Real Party of Interest PROCESS SERVER-Elizabeth Woelfel**

**WHEREFORE**, Deborah Ann Buczek, respectfully moves the Court to grant the instant Motion

to Dismiss and for such other and further relief as this Court deems just and proper and

subsequently the entirety of the action brought by the plaintiff in this matter be wholly dismissed

for the reasons and upon the grounds as detailed herein.  Once again in the interests of justice as

well as saving the time and expense of the court regarding an appeal in this matter, a duty exists

to examine the facts as detailed herein and to act accordingly with judicial discretion. In

Compliance with Title 28 U.S.C. Sec. 1746 (1) , I affirm under the penalties of perjury, & to the

laws of the De Jure united States of America, that the foregoing is true, correct & complete to the

best of my belief & informed knowledge, & Further the Deponent Saith Not. I now affix my seal

and Autograph & Official Seal to the above Document with EXPLICT RESERVATION OF

ALL MY UNALIENABLE RIGHTS, WITHOUT PREJUDICE TO ANY OF THOSE RIGHTS

Respectfully,

*Deborah Ann Buczek*

Deborah Ann Buczek

Subscribed and sworn to before me this ~~14th~~ 17TH day

of ~~November 2014.~~ 2015. February

*Robin L. Dudek*

Notary Public     ROBIN L. DUDEK
Notary Public, State of New York
01DU6101214
Qualified in Erie County
My Commission Expires November 10, 2015

PO Box 93
Derby, New York 140470
(716)-870-0450

## CERTIIFATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **MOTION TO DISMISS FOR IMPROPER SERVICE NOR EXCLAMATION** motion to quash or dismiss because of invalid or improper service of process and it was based upon the failure of the process server to provide any explanation of the summons or the complaint was furnished via US Mail this 16TH day of February, 2015 AD to Mark K. Broyles 28 Main Street Suite 1800 Rochester New York [14614]

Dated this _1 7_ the day of _Feb_ , 2015

By: Deborah Ann Buczek

Deborah Ann Buczek

4

# Exhibit (A)

ERIE COUNTY CLERK'S OFFICE



County Clerk's Recording Page

Return to:

**Book Type: K Book: 373 Page: 450**
Page Count:      2
Doc Type:        HARDCOPY DOCUMENT-
SCANNED

Party 1:
AFFIDAVIT OF SERVICE

Rec Date:        02/02/2015
Rec Time:        12:17:56 PM
Control #:       2015020224

Party 2:

UserID:          MC
Trans #:         15016822
Document Sequence Number
  I 2015600022

**Recording Fees:**

RECORDING           $0.00

**Consideration Amount:**

| | |
|---|---|
| BASIC MT | $0.00 |
| SONYMA MT | $0.00 |
| ADDL MT/NFTA | $0.00 |
| SP MT/M-RAIL | $0.00 |
| NY STATE TT | $0.00 |
| ROAD FUND TT | $0.00 |

**Total: $0.00**

STATE OF NEW YORK
ERIE COUNTY CLERK'S OFFICE

COURT DOCUMENT SCANNED TO CREATE ELECTRONIC RECORD

Christopher L. Jacobs
County Clerk

PHIN, SUCH & CRANE, LLP – NORTHERN PARTNER    1800 FIRST FEDERAL PLAZA ROCHESTER, NY 14614

## AFFIDAVIT OF SERVICE

Client's File No.: PKNC 2913

**COUNTY COURT OF THE STATE OF NEW YORK**
**COUNTY OF ERIE**

Index Number: 2015000022

Date Filed: January 21, 2015



*Keybank National Association*

Plaintiff/Petitioner(s)

vs

*Deborah A. Buczek a/k/a Deborah Ann Gale Buczek a/k/a Deborah Ann Gall Buczek a/k/a Deborah Gall Buczek, et al.*

Defendant(s)/Respondent(s)

STATE OF NEW YORK, COUNTY OF ERIE , SS.:

The undersigned being duly sworn deposes and says: that deponent is not a party to this action, is over 18 years of age and resides in the State of New York. That on the following date: **Jan 23, 2015** , at the following time: **9:22 Am.**
at _____ 7335 Derby Road, Derby, NY 14047 _____ deponent served the within
Summons and Complaint with Notice of Pendency of Action

[X] Papers so served were properly endorsed with the Index Number and date of filing.

Upon: Doe a/k/a **Caleb Buczek**

[ ] **Individual** — By delivering a true copy thereof to said recipient personally; deponent knew the person so served to be the individual described therein.

[✓] **Responsible Person** — By delivering to and leaving with **Dan Buczek** **Co-occupant**
a true copy thereof, a person of suitable age and discretion. Said premises being the defendant / respondent's
[✓] dwelling place    [ ] place of business/employment    [ ] last known address within the State. [ ] usual place of abode

[✓] **Mail** — A copy thereof was deposited in a postpaid, properly addressed envelope, marked "Personal and Confidential" in a depository maintained by the U. S. P. S. and mailed to the above address on **Jan 23 2015** .

[ ] **Corporation LLC / LLP** — By delivering to and leaving with _____ said individual to be
who specifically stated he/she was authorized to accept service on behalf of the Corporation/Government Agency/Entity.

[ ] **Affixing To Door** — By affixing a true copy thereof to the door, being the defendant/respondent's [ ] dwelling place    [ ] place of business/employment
[ ] last known address within the State. [ ] usual place of abode

[ ] **Previous Attempts** — Deponent previously attempted to serve the above named defendant/respondent on:
1) _____ at _____   3) _____ at _____   5) _____ at _____
2) _____ at _____   4) _____ at _____   6) _____ at _____

**Description of Recipient** — Sex: **Male** Color of skin: **White** Color of hair: **White** Age: **57-71** Height: **5'8"-6'2"**
Weight: **175-205** Other Features: **goatee / mustache**

[ ] **Witness Fees** — advanced payment was made.

[ ] **Military Service** — I asked the person spoken to whether the defendant/respondent was in active military service and received a negative reply. The person spoken with wore ordinary civilian clothes and no military uniform. The source of my information and the grounds of my belief are the conversations and observations defendant/respondent narrated above. Upon information and belief, I aver that the recipient is not in military service.

[ ] **Other**

Sworn to before me on **Jan 23, 2015**

_____
NOTARY PUBLIC

_____
PROCESS SERVER - PRINT NAME BELOW SIGNATURE
**Elizabeth Woelfel**
PROCESS SERVER LICENSE # _____

Work Order # **7329626**

Monique ... Leasing
*Notary Public, State of New York*
*Reg # 01GE6...*
*Qualified in Erie County*
*Commission Expires Feb ... 20...*

**Tracking Number: 70133020000089568932**
Image of a progress bar displaying delivered status
Delivered-Updated Delivery Day: Tuesday, February 24, 2015

February 23, 2015, 10:50 am-Delivered-CLEVELAND, OH 44144

Your item was delivered at 10:50 am on February 23, 2015 in CLEVELAND, OH 44144.

February 23, 2015, 10:32 am-Arrived at Unit-CLEVELAND, OH 44144 -February 21, 2015, 8:56 pm-Departed USPS Facility-CLEVELAND, OH 44101

February 21, 2015, 2:18 pm-Arrived at USPS Facility-CLEVELAND, OH 44101

February 20, 2015, 11:50 pm-Departed USPS Facility-BUFFALO, NY 14240

February 20, 2015, 9:47 pm-Arrived at USPS Origin Facility-BUFFALO, NY 14240

February 20, 2015, 7:00 pm-Departed Post Office-HAMBURG, NY 14075

February 20, 2015, 10:30 am-HAMBURG, NY 14075

Deborah Ann Buczek Executrix
Postal Office 93
Derby New York [14047]
PRIVATE CONFIDENTIAL

**Certified Mail#**       7013 3020 0000 8956 8932

Mark K. Broyles, Esq-FKNC2913
Not the Real party of interest Rule 17a
28 Main Street, Suite 1800
Rochester, New York [14614]
585-232-7400
Private confidential

Susan H. Cahill-MANAGER
6932 Erie Road
Derby, New York near federal zone [14047]
716-947-2015
Private confidential

Key National
FR FORM 26
Postal Office 93885
Cleveland Ohio, near federal zone [44101-5885]
OH-01-51-0562
4910 Tiedeman Road
Brooklyn, Ohio [44144]
Attn: Mortgage loan accounting department

Re: Private Property care of 7335 Derby Road
Derby, New York outside federal zone [14047]

Account Number: 96329002524950

Dear Sir or Madam Agent of Key National:

    Deborah Ann Buczek is the real LENDER AND OWNER OF THE ACCOUNT
See FR form 26. We dispute the amount that is owned according the Monthly Billing
Statement and request that you send us information about the fees, costs, and escrow
accounting on our loan. This is a Qualified Written Request, pursuant to Real Estate
Settlement and Procedures Act section (2605(e)). Specifically, we are requesting the

1

itemization of the following: The current interest rate on this account. The adjustment dates of each interest rate adjustment on this account, with the corresponding adjustment amount. Who the current holder of the mortgage is, and their mailing address for process of service, along with a current telephone number. Who the current holder of the note is, and their mailing address for process of service, along with a current telephone number. The date that the current holder acquired this mortgage and from whom it was acquired from. The date your firm began servicing the loan. The previous servicer of the loan. The monthly principal and interest payments, and monthly escrow payments received from the date of the loan's closing to the date of this QWR;A complete payment history of how those payments were applied, including the amounts applied to principal, interest, escrow, and other charges; A breakdown of all charges accrued on the account since the date of closing, that includes but is not limited by, late charges, appraisal fees, property inspection fees, forced placed insurance charges, legal fees, and recoverable corporate advances. A statement indicating which covenants of the mortgage and/or note authorize each charge. Please provide a copy of all appraisals, property inspections, and risk assessments completed for this account. Please provide a copy of all trust agreements pertaining to this account. Please provide a copy of all servicing agreements (master, sub-servicing, contingency, specialty, and back-up) pertaining to this account. Please provide a copy of all written loss-mitigation rules and work-out procedures for this account. Please provide a copy of all manuals pertaining to the servicing of this account. Please provide a copy of the LSAMS Transaction History Report for this account, and include a description of all fee codes.

1.  A complete payment history that can be easily read and understood including, but not limited to, the dates and amounts of all the payments made on the loan to date; with PROOF OF CLAIM/ DISCOVERY with the ORIGINAL NOTE.

2.  A breakdown of the amount of claimed arrears of delinquencies; PROOF OF CLAIM/ DISCOVERY. Show Me the Original Note and I Will Show You the Money and inspection the Original Promissory Note authority to act, pursuant to, inter alia, U.C.C. § 3-501(B)(2).

3.  An explanation of what you mean by assignment, sale, or transfer.  Which one is it? Please include a copy of any all assignments, proof of sale, proof of transfer and to whom. How many times did you sell are original note? Did you pay the taxes? PROOF OF CLAIM/ DISCOVERY Show Me the Original Note and I Will Show You the Money.

4.  The payment dates, purpose of payment and recipient of all escrow items charged to our account since the loans inception. PROOF OF CLAIM/ DISCOVERY. Show Me the Original Note and I Will Show You the Money.

5.  A breakdown of the current escrow charges showing how it is to calculated and reasons for any increase within the last 24 months; and PROOF OF CLAIM/ DISCOVERY. Show Me the Original Note and I Will Show You the Money.

6.  A copy of any annual escrow statements and notices of shortage, deficiency or surplus, sent us within the life of the current loan. PROOF OF CLAIM/ DISCOVERY. Show Me the Original Note and I Will Show You the Money.

7. This correspondence will serve to memorialize my [hereinafter "Deborah Ann Buczek SPC" UCC NY DOS FILING NUMBER **201405120259837** dispute with the above referenced mortgage loan through your office, and as Notice of my Intent to file legal action pursuant to the New York Code of Civil and Federal Rules of Civil Procedure within 30 days from this date in the Western District of New York Federal Court house.

8. Further, this notice will serve as a notice to rescind the above-referenced mortgage loan based on your violations of the each of the following federal and state laws, including, but not limited to, the Truth in Lending Act ("TILA") and Real Estate Settlement Procedures Act ("RESPA"), New York Unfair/Deceptive Business Practices Act, Breach of Fiduciary Duty, Breach of the Implied Covenant of Good Faith and Fair Dealing, Civil Code §1688, and others.

VIOLATION OF TRUTH IN LENDING ACT (TILA)

9. The purpose of TILA is "to assure meaningful disclosure of credit terms to enable consumers to become informed about the cost of loans and to compare the credit options available to them." If the interest rate is not fixed, then the Truth in Lending Disclosure Statement must inform the DEBORAH A BUCZEK of the variable rate feature of the loan. Additionally, federal courts have held that "a misleading disclosure is as did not deliver good faith estimates of disclosures (preliminary TILDS) within 3 days of loan application.

10. The Truth in Lending disclosure was not provided Consumer Handbook on Adjustable Rate Mortgages" (CHARM) was not provided within 3 days.

4

11. Each of these violations is subject to civil remedies in law and equity, in addition to the Recovery of attorney's fees and costs of litigation.

## VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

12. There is no evidence to confirm that the DEBORAH A BUCZEK received all of the disclosures mandated by law. The transfer servicing disclosure, special information booklet and affiliated business agreement disclosures do not appear to have been received by the DEBORAH A BUCZEK.

13. Did not disclosed all affiliated business arrangements.HUD-1 was not provided at closing (or 1 day before if requested) and accurate. See Smith v. Chapman, 614 F.2d 968, 977 (5th Cir. 1980); and Barnes v. Fleet Nat'l Bank, 370 F.3d 164, 174 (1st Cir. 2004) (quoting Smith v. Chapman).

12 C.F.R. §§ 226.19(a)

12 C.F.R. § 226.23(b)

12 C.F.R. §§ 226.17, 226.18

12 C.F.R. § 226.4(d) (2)

12 CFR § 226.19(b)

24 C.F.R. § 3500.15

## FIDUCIARY DUTY AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

14. Unfair competition includes any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. Here, numerous violations of the CA B&P Code have occurred.

15. Underwriting Standards Were Ignored; DEBORAH A BUCZEK Qualification Based on Value of Collateral, Rather than Ability to Repay the Loan. The purpose of an underwriter is to determine whether the DEBORAH A BUCZEK can qualify for a loan and if the DEBORAH A BUCZEK has the ability to repay the loan. This determination of the ability to repay a loan is based upon employment and income in large measure, proved by getting pay stubs, 1040's, W-2's and a Verification of Employment and Income on the DEBORAH A BUCZEKs.

16. If an underwriter has evaluated the loan properly, then there should be no question of the ability of the DEBORAH A BUCZEK to repay the loan.

17. Debt ratios will have been evaluated, credit reviewed and a proper determination of risk should have been made in relation to the loan amount. Approvals and denials would be made based upon a realistic likelihood of repayment.

18. If the underwriter had performed his/her duties accordingly, he/she would have declined this loan due to the inability of the DEBORAH A BUCZEK to pay or did they sell the note?

19. Further this loan was a stated income loan and was apparently underwritten with an automated underwriting system which is merely intended to be a guide or a preliminary approval system. The underwriter failed to properly examine this loan, and as a result, DEBORAH A BUCZEK has been seriously damaged.

<u>Predatory Lending</u>

20. The Office of Comptroller of the Currency defines Predatory Lending as any lien secured by real estate which shares well known common characteristics that result in unfair and deceptive business practices. Some of those characteristics here include: DEBORAH A BUCZEK was a minority and/or the transaction was conducted in a foreign language. Other unfair, deceptive, or fraudulent practices in transaction.

   24 C.F.R. § 3500.8(b)

   24 C.F.R. § 3500.21

21. As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Sect ion 17500) of Part 3 of Division 7 of the Business and Professions Code. Mortgage broker and corresponding lender involved.

22. Breach of Fiduciary Duty Both lender and broker has a fiduciary responsibility to the DEBORAH A BUCZEK. The fiduciary duty of the broker (i.e. duty of trust) is to deal with the consumer in good faith. If the broker knew or should have known that the DEBORAH A BUCZEK will or has a likelihood of defaulting on this loan, he/she had a fiduciary duty to DEBORAH A BUCZEK to not place them in that loan (in harm's way).

23. The fiduciary duty of the broker, as agent for the lender, is the same – to deal with the consumer in good faith, educate the DEBORAH A BUCZEK about loan programs, other options are available to the DEBORAH A BUCZEK, perform their own diligence to determine if the DEBORAH A BUCZEK are

7

being placed in a loan that is legal, properly disclosed, is the best loan for the
DEBORAH A BUCZEK given their financial circumstance, and is affordable
over the life of the loan.

24. Here, the DEBORAH A BUCZEK was placed into the current loan product
without regard for the ability to repay the loan, likely they would default or
incur bankruptcy as a result of the loan and it was reasonably foreseeable that
such would occur.

25. In addition, the above-described acts were a breach of the implied covenant of
good faith and fair dealing.

<u>VIOLATION OF NEW YORK CIVIL CODE</u>

26. The New York Civil Code has certain provisions that are intended to protect
DEBORAH A BUCZEKs when attempting to procure a loan from a financial
institution or lender:

27. First, the law requires certain procedural safeguards to protect the DEBORAH
A BUCZEK such as receipt of specific disclosure notices from the lender. Civil
Code §§ 1916.5 and 1916.7. An applicant for a loan pursuant to the provisions
of this section must be given a disclosure notice in the following form:

"NOTICE TO IMPORTANT INFORMATION ABOUT THE
ADJUSTABLEPAYMENT, ADJUSTABLE-RATE LOAN.
PLEASE READ CAREFULLY"...

28. This disclosure was not provided to the DEBORAH A BUCZEK at any time
during the processing of this Loan, nor was any alternative loan products
offered to the DEBORAH A BUCZEK.

29. Also, the lender must notify DEBORAH A BUCZEKs of any changes in the interest rate and monthly.

30. Payment of a loan. The fully amortized rate changes monthly, so the DEBORAH A BUCZEK should be notified monthly, in accordance with the above statute. Lender has failed to do so and violated the law.

31. Additional violations of Civil Code §§ 1920-1921 have occurred: adjustment of rate did not take into consider the ability of DEBORAH A BUCZEK to repay; change in rate was not reflected in security instrument; DEBORAH A BUCZEK was not provided notice of change of rate monthly; there was a prepayment penalty in the note; DEBORAH A BUCZEK was not adequately advised of negative amortization.

32. These civil code violations carry with them damages, attorney's fees, costs of suit, and other legal and equitable relief.

SECURITIZATION & MERS & QUALIFIED WRITTEN REQUESTS

33. Mortgage Electronic Registration System (MERS) has been named the beneficiary for this loan.

34. MERS was created to eliminate the need for the executing and recording of assignment of mortgages, with the idea that MERS would be the mortgagee of record. This would allow "MERS" to foreclose on the property, and at the same time, assist the lenders in avoiding the recording of the Assignments of Beneficiary on loans sold. This saved the lenders money in manpower and the costs of recording these notes. It was also designed to "shield" investors from

liability as a result of lender misconduct regarding the process of mortgage lending.

35. MERS is simply an "artificial" entity designed to circumvent certain laws and other legal Requirements dealing with mortgage loans. By designating certain member employees to be MERS corporate officers, MERS has created a situation whereby the foreclosing agency and MERS "designated officer" has a conflict of interest.

36. Since neither MERS nor the servicer have a beneficial interest in the note, nor do they receive the income from the payments, and since it is actually an employee of the servicer signing the assignment in the name of MERS, the assignment executed by the MERS employee is illegal. The actual owner of the note has not executed the assignment to the new party. An assignment of a mortgage in the absence of the assignment and physical delivery of the note will result in a nullity. It must also be noted that the lender or other holder of the note registers the loan on MERS.

### 18 U.S. Code § 2071 - Concealment, removal, or mutilation generally

(a) Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.
(b) Whoever, having the custody of any such record, proceeding, map, book, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States. As used in this subsection, the term "office" does not include the office held by any person as a retired officer of the Armed Forces of the United States.

10

37. Thereafter, all sales or assignments of the mortgage loan are accomplished electronically under the M ERS system.MERS never acquires actual physical possession of the mortgage note, nor do they acquire any beneficial interest in the note.

38. The existence of MERS constitutes numerous violations of the California Business and Professions Code, as well as Unfair and Deceptive Acts and Practices, due to the conflicting nature and identity of the servicer and the beneficiary. Each of these practices was intentionally designed to mislead the DEBORAH A BUCZEK and benefit the pretend lenders. A landmark ruling in a recent Kansas Supreme Court case may have given millions of distressed homeowners the legal wedge they need to avoid foreclosure. In Landmark National Bank v. Kesler, 2009 Kan. LEXIS 834, the Kansas Supreme Court held that a nominee company called MERS has no right or standing to bring an action for foreclosure. MERS is an acronym for Mortgage Electronic Registration Systems, a private company that registers mortgages electronically and tracks changes in ownership. The significance of the holding is that if MERS has no standing to foreclose, then nobody has standing to foreclose -- on 60 million mortgages. That is the number of American mortgages currently reported to be held by MERS. Over half of all new U.S. residential mortgage loans are registered with MERS and recorded in its name. Holdings of the Kansas Supreme Court are not binding on the rest of the country, but they are dicta of which other courts take note; and the reasoning behind the decision is sound.

39. To the extent that this loan has been sold, transferred or assigned, this letter shall also serve as a Qualified Written Request pursuant to pursuant to RESPA (12 USC §2601 et seq.), for the following information:

40. All documents which relate to the original loan transaction which is the subject of this request (hereinafter, the "transaction"), including but not limited to, loan application(s), good faith estimate(s), loan commitment letter(s), Truth in Lending Disclosure Statement(s), Notice(s) of Right to Cancel, HUD-1 or final settlement statement(s), promissory note(s)/agreement(s), mortgage(s)/deed(s) of trust.

41. All purchase and sale of mortgage agreements, sale or transfer of servicing rights or other similar agreement related to any assignment, purchase or sale of the mortgage loan or servicing rights by you, any broker, affiliate company, parent company, servicers, bank, government sponsored enterprise, sub-servicers, mortgage broker, mortgage banker or any holder of any right related to the mortgage, promissory note and deed of trust from the inception of the loan to the present date.

42. All assignments, transfers, or other documents evidencing a transfer, sale or assignment of the mortgage, deed of trust, promissory note or other document that secures payment by me to the obligation in this account from the inception of the loan to the present date.

43. All deeds in lieu, modifications to the mortgage, promissory note or deed of trust from the inception of the loan to the present date.

12

44. I hereby demand from you of a Certified True and Correct copy of the Promissory Note, front and back, **original only!** With endorsements and all allonges attached.

45. I hereby demand from you of a Certified True and Correct copy of the Deed of Trust, front and back, including all assignments.

46. I also hereby demand that a chain of transfer from you to wherever the security is now be promptly sent to me as well. Absent the actual evidence of the security I have no choice but to dispute the validity of your lawful ownership, funding, entitlement right, and the current debt you say I owe. By debt I am referring to the principal balance you claim I owe; the calculated monthly payment, calculated escrow payment and any fees claimed to be owed by you or any trust or entity you may service or sub-service for. **See Attachment of UCC 11 SEARCH SHOWNG NO LIENS FROM KEY NATIONAL**

47. To independently validate this debt, I need to conduct a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. Upon receipt of this letter, please refrain from reporting any negative credit information (if any) to any credit-reporting agency until you respond to each of the requests.

48. I also request that you conduct your own investigation and audit of this account since its inception to validate the debt you currently claim I owe. I would like you to validate the debt so that it is accurate to the penny!

49. Please do not rely on previous servicing companies or originators records, assurances or indemnity agreements and refuse to conduct a full audit and investigation of this account.

50. I understand that potential abuses by you or previous servicing companies could have deceptively, wrongfully, unlawfully, and/or illegally:

51. Increased the amounts of monthly payments;

52. Increased the principal balance I owe;

53. Increased the escrow payments;

54. Increased the amounts applied and attributed toward interest on this account;

55. Decreased the proper amounts applied and attributed toward the principal on this account; and/or Assessed, charged and/or collected fees, expenses and miscellaneous charges I am not legally obligated to pay under this mortgage, note and/or deed of trust. I request you insure that I have not been the victim of such predatory servicing and lending practices. To insure this, I have authorized a thorough review, examination; accounting and audit of mortgage account no. 327860036877 and 96329002524950 by mortgage auditing and predatory servicing or lending experts. This exam and audit will review this mortgage account file from the date of initial contact, application and the origination of this account to the present date written above. Again, this is a Qualified Written Request under the Real Estate Settlement Procedures Act, codified as Title 12 section 2605(e) of the United States Code as well as a request under the Truth in Lending Act 15 U.S.C. section 1601. RESPA

provides substantial penalties and fines for non-compliance or failure to answer my questions provided in this letter within sixty (60) days of its receipt.

56. In order to conduct the forensic examination and audit of this loan, I need to have full and immediate production of all of the information requested above. The documents requested and answers to my questions are needed by me and others to ensure that this loan: Was originated in lawful compliance with all federal and state laws, regulations including, but not limited to Title 62 of the Revised Statutes, RESPA, TILA, Fair Debt Collection Practices Act, HOEPA and other laws;

57. That the origination and/or any sale or transfer of this account or monetary instrument, was conducted in accordance with proper laws and was a lawful sale with complete disclosure to all parties with an interest;

58. That you disclose the claimed holder in due course of the monetary instrument/deed of trust/asset is holding such note in compliance with statutes, State and Federal laws and is entitled to the benefits of payments;

59. That all good faith and reasonable disclosures of transfers, sales, Power of Attorney, monetary instrument ownership, entitlements, full disclosure of actual funding source, terms, costs, commissions, rebates, kickbacks, fees etc. were and still are properly disclosed to me, including but not limited to the period commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

15

60. That each servicers and/or sub-servicers of this mortgage has serviced this mortgage in accordance with statute, laws and the terms of mortgage, monetary instrument/deed of trust, including but not limited to all accounting or bookkeeping entries commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

61. That each servicers and/or sub-servicers of this mortgage has serviced this mortgage in compliance with local, state and federal statutes, laws and regulations commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof, ;

62. That this mortgage account has been credited, debited, adjusted, amortized and charged correctly and disclosed fully commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof ;

63. That interest and principal have been properly calculated and applied to this loan;

64. That any principal balance has been properly calculated, amortized and accounted for;

65. That no charges, fees or expenses, not obligated by me in any agreement, have been charged, assessed or collected from this account or any other related account arising out of the subject loan transaction.

16

66. Please provide me with the documents I have requested and a detailed answer to each of my questions within the lawful time frame. Upon receipt of the documents and answers, an exam and audit will be conducted that may lead to a further document request and answers to questions under an additional RESPA Qualified Written Request letter.

67. Copies of this Qualified Written Request, Validation of Debt, TILA and request for accounting and legal records, Dispute of Debt letter are being sent to all relevant state and federal regulators; and other consumer advocates; and my congressman.

68. It is my hope that you answer this RESPA request in accordance with law and the questions, documents and validation of debt to the penny and correct abuses or schemes uncovered and documented.

Default Provisions under this QUALIFIED WRITTEN REQUEST

69.  Key national or any agents, transfers, or assigns omissions of or agreement by silence of this RESPA REQUEST via certified rebuttal of any and all points herein this RESPA REQUEST, agrees and consents to including but not limited by any violations of law and/or immediate terminate/remove any and all right, title and interest (liens) in DEBORAH A BUCZEK TRUST or any property or collateral connected to DEBORAH A BUCZEK TRUST  or account 327860036877 &  96329002524950  and waives any and all immunities or defenses in claims and or violations agreed to in this RESPA REQUEST including but not limited by any and all: in DEBORAH A BUCZEK TRUST's right, by breach of fiduciary responsibility and fraud and

17

misrepresentation revocation and rescinding any and all power of attorney or appointment Key national may have or may have had in connection with account 327860036877 & 96329002524950 and any property and/or real estate connected with account 327860036877 & 96329002524950 .

70. DEBORAH A BUCZEK Trusts' right to have any certificated or uncertificated security re-registered in DEBORAH A BUCZEK TRUST's, and only Deborah Ann Buczek's name.

71. DEBORAH A BUCZEK Trusts' right of collection via Key national liability insurance and/or bond.

72. DEBORAH A BUCZEK's entitlement in filing and executing any instruments, as power of attorney for and by KEY NATIONAL, including but not limited by a new certificated security or any security agreement perfected by filing a UCC Financing Statement with the Secretary of State in the State where Key National is located which is in the Department of State New York. See Attachment of  no liens filed by your Company which means you don't have a security interest.(UCC 11 SEARCH) for Account No. 96329002524950

73. DEBORAH A BUCZEK's right to damages because of Key National's wrongful registration, breach of intermediary responsibility with regard to DEBORAH A BUCZEK's asset by Key National issuing to DEBORAH A BUCZEK a certified check for the original value of DEBORAH A BUCZEK's monetary instrument.

74. DEBORAH A BUCZEK's right to have account  completely set off because Key National's wrongful registration, breach of intermediary responsibility

18

with regard to DEBORAH A BUCZEK's monetary instrument/asset by Key National sending confirmation of set off of wrongful liability of DEBORAH A BUCZEK TRUST ACCOUNT and issuing a certified check for the difference between the original value of DEBORAH A BUCZEK's monetary instrument/asset and what DEBORAH A BUCZEK'S TRUST ACCOUNT aka (T.T.L. ACCOUNT) mistakenly sent to Key National as a payment for such wrongful liability. DEBORAH A BUCZEK hereby demands:

75. That, pursuant to the above regulations, lender shall rescind the loan made by defendants to secure the property and all security instruments in connection with those loans; and that all costs to acquire those loans plus all interest paid shall be refunded to DEBORAH A BUCZEK TRUST.

76. That Pretend lender reimburse DEBORAH A. BUCZEK TRUST for all costs to resolve this issue, including but not limited to attorney's fees, investigation fees, and out of pocket costs and expenses.

77. That Key National pretended lender pays damages in the amount of $ 1,000,000,000.00[one million US Dollars] to DEBORAH A BUCZEK for stress, harassment, threats, and public detriment of DEBORAH A BUCZEK's and steals funds out of TRUST ACCOUNT and her character.

78. Key National or any transfers, agents or assigns offering a rebuttal of this RESPA REQUEST must do so in the manner of this RESPA REQUEST in accordance of and in compliance with current statutes and/or laws by signing in the capacity of a fully liable man or woman being responsible and liable under the penalty of perjury while offering direct testimony with the official

capacity as appointed agent for KEY NATIONAL ASSOCIATION  in accordance with KEY NATIONAL's Articles of Incorporation, By Laws duly signed by a current and duly sworn under oath director(s) of such corporation/ Holding Corporation/ National Association. Any direct rebuttal with certified true and complete accompanying proof must be posted with the Notary address herein within sixty days. When no verified rebuttal of this RESPA REQUEST is made in a timely manner, a "Certificate of Non-Response" serves as KEY NATIONAL's judgment and consent/agreement by means of silence with any and all claims and/or violations herein-stated in the default provisions or any other law.

Conclusion: A statement indicating the amount to pay this loan off in full as March 2015.I hereby dispute all late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged to this account. Additionally, I believe my account is in error. Pursuant to 12 U.S.C. § 2605(e), you are hereby notified that placing any negative coding on my credit report before responding to this letter is a violation of RESPA and the FCRA. Your organization will be subject to civil liability if negative coding appears for this account before a response to this QWR is issued to me. Please provide me confirmation that you have received this QWR within 20 days, as required under 12 U.S.C. § 2605(e). Thereafter, please respond to these questions within 60 days of receipt of this letter, also as required under 12 U.S.C. § 2605(e)

** Your silence is your acquiescence.  See:  Connelly v. General Construction Co., 269 U.S. 385, 391.  Notification of legal responsibility is "the first essential of due process of law."  Also, see:  U.S. v. Tweel, 550 F. 2d. 297. "Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading."

Show Me the Original Note and I Will Show You the Money and inspection the Original Promissory Note authority to act, pursuant to, inter alia, U.C.C. § 3-501(B)(2).

## ACKNOWLEDGMENT

In Compliance with Title 28 U.S.C. Sec. 1746 (1) & executed WITHOUT THE UNITED STATES, I affirm under the penalties of perjury, & to the laws of the De Jure united States of America, that the foregoing is true, correct & complete to the best of my belief & informed knowledge, & Further the Deponent Saith Not. I now affix my seal and Autograph & Official Seal to the above Document with EXPLICT RESERVATION OF ALL MY UNALIENABLE RIGHTS, WITHOUT PREJUDICE TO ANY OF THOSE RIGHTS, in compliance with UCC Section 1-308

BY:  _Deborah Ann Buczek_

Deborah-Ann: Buczek/ UCC 1-308
Dated: February 19, 2015
NY DOS UCC FILING 201405120259837

See Attachments & Exhibit's

Attachment for Keybank:

Foreclosure Fraud Revealed: Your Mortgage Documents Are Fake!

Thu, 8/15/2013 - by David Dayen

This article originally appeared on Salon

 9036  84 reddit2  57

If you know about foreclosure fraud, the mass fabrication of mortgage documents in state courts by banks attempting to foreclose on homeowners, you may have one nagging question: Why did banks have to resort to this illegal scheme? Was it just cheaper to mock up the documents than to provide the real ones? Did banks figure they simply had enough power over regulators, politicians and the courts to get away with it? (They were probably right about that one.)

A newly unsealed lawsuit, which banks settled in 2012 for $95 million, actually offers a different reason, providing a key answer to one of the persistent riddles of the financial crisis and its aftermath. The lawsuit states that banks resorted to fake documents because they could not legally establish true ownership of the loans when trying to foreclose.

This reality, which banks did not contest but instead settled out of court, means that tens of millions of mortgages in America still lack a legitimate chain of ownership, with implications far into the future. And if Congress, supported by the Obama administration, goes back to the same housing finance system, with the same corrupt private entities who broke the nation's private property system back in business packaging mortgages, then shame on all of us.

The 2011 lawsuit was filed in U.S. District Court in both North and South Carolina, by a white-collar fraud specialist named Lynn Szymoniak, on behalf of the federal government, 17 states and three cities. Twenty-eight banks, mortgage servicers and document processing companies are named in the lawsuit, including mega-banks like JPMorgan Chase, Wells Fargo, Citi and Bank of America.

Szymoniak, who fell into foreclosure herself in 2009, researched her own mortgage documents and found massive fraud (for example, one document claimed that Deutsche Bank, listed as the owner of her mortgage, acquired ownership in October 2008, four months after they first filed for foreclosure). She eventually examined tens of thousands of documents, enough to piece together the entire scheme.

A mortgage has two parts: the promissory note (the IOU from the borrower to the lender) and the mortgage, which creates the lien on the home in case of default. During the housing bubble, banks bought loans from originators, and then (in a process known as securitization) enacted a series of transactions that would eventually pool thousands of mortgages into bonds, sold all over the world to public pension funds, state and municipal governments and other investors. A trustee would pool the loans and sell the securities to investors, and the investors would get an annual percentage yield on their money.

1

In order for the securitization to work, banks purchasing the mortgages had to physically convey the promissory note and the mortgage into the trust. The note had to be endorsed (the way an individual would endorse a check), and handed over to a document custodian for the trust, with a "mortgage assignment" confirming the transfer of ownership. And this had to be done before a 90-day cutoff date, with no grace period beyond that.

Georgetown Law professor Adam Levitin spelled this out in testimony before Congress in 2010: "If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever."

The lawsuit alleges that these notes, as well as the mortgage assignments, were "never delivered to the mortgage-backed securities trusts," and that the trustees lied to the SEC and investors about this. As a result, the trusts could not establish ownership of the loan when they went to foreclose, forcing the production of a stream of false documents, signed by "robo-signers," employees using a bevy of corporate titles for companies that never employed them, to sign documents about which they had little or no knowledge.

Many documents were forged (the suit provides evidence of the signature of one robo-signer, Linda Green, written eight different ways), some were signed by "officers" of companies that went bankrupt years earlier, and dozens of assignments listed as the owner of the loan "Bogus Assignee for Intervening Assignments," clearly a template that was never changed. One defendant in the case, Lender Processing Services, created masses of false documents on behalf of the banks, often using fake corporate officer titles and forged signatures. This was all done to establish standing to foreclose in courts, which the banks otherwise could not.

Szymoniak stated in her lawsuit that, "Defendants used fraudulent mortgage assignments to conceal that over 1400 MBS trusts, each with mortgages valued at over $1 billion, are missing critical documents," meaning that at least $1.4 trillion in mortgage-backed securities are, in fact, non-mortgage-backed securities. Because of the strict laws governing of these kinds of securitizations, there's no way to make the assignments after the fact. Activists have a name for this: "securitization FAIL."

One smoking gun piece of evidence in the lawsuit concerns a mortgage assignment dated Feb. 9, 2009, after the foreclosure of the mortgage in question was completed. According to the suit, "A typewritten note on the right hand side of the document states: 'This Assignment of Mortgage was inadvertently not recorded prior to the Final Judgment of Foreclosure… but is now being recorded to clear title.'"

This admission confirms that the mortgage assignment was not made before the closing date of the trust, invalidating ownership. The suit further argued that "the act of fabricating the assignments is evidence that the MBS Trust did not own the notes and/or the mortgage liens for some assets claimed to be in the pool."

The federal government, states and cities joined the lawsuit under 25 counts of the federal False Claims Act and state-based versions of the law. All of them bought mortgage-backed securities from banks that never conveyed the mortgages or notes to the trusts. The plaintiffs argued that, considering that trustees and servicers had to spend lots of money forging and fabricating documents to establish ownership, they were materially harmed by the subsequent impaired

value of the securities. Also, these investors (which includes the Treasury Department and the Federal Reserve) paid for the transfer of mortgages to the trusts, yet they were never actually transferred.

Finally, the lawsuit argues that the federal government was harmed by "payments made on mortgage guarantees to Defendants lacking valid notes and assignments of mortgages who were not entitled to demand or receive said payments."

Despite Szymoniak seeking a trial by jury, the government intervened in the case, and settled part of it at the beginning of 2012, extracting $95 million from the five biggest banks in the suit (Wells Fargo, Bank of America, JPMorgan Chase, Citi and GMAC/Ally Bank). Szymoniak herself was awarded $18 million. But the underlying evidence was never revealed until the case was unsealed last Thursday.

Now that it's unsealed, Szymoniak, as the named plaintiff, can go forward and prove the case. Along with her legal team (which includes the law firm of Grant & Eisenhofer, which has recovered more money under the False Claims Act than any firm in the country), Szymoniak can pursue discovery and go to trial against the rest of the named defendants, including HSBC, the Bank of New York Mellon, Deutsche Bank and US Bank.

The expenses of the case, previously borne by the government, now are borne by Szymoniak and her team, but the percentages of recovery funds are also higher. "I'm really glad I was part of collecting this money for the government, and I'm looking forward to going through discovery and collecting the rest of it," Szymoniak told Salon.

It's good that the case remains active, because the $95 million settlement was a pittance compared to the enormity of the crime. By end of 2009, private mortgage-backed securities trusts held one-third of all residential mortgages in the U.S. That means that tens of millions of home mortgages worth trillions of dollars have no legitimate underlying owner that can establish the right to foreclose. This hasn't stopped banks from foreclosing anyway with false documents, and they are often successful, a testament to the breakdown of law in the judicial system. But to this day, the resulting chaos in disentangling ownership harms homeowners trying to sell these properties, as well as those trying to purchase them. And it renders some properties impossible to sell.

To this day, banks foreclose on borrowers using fraudulent mortgage assignments, a legacy of failing to prosecute this conduct and instead letting banks pay a fine to settle it. This disappoints Szymoniak, who told Salon the owner of these loans is now essentially "whoever lies the most convincingly and whoever gets the benefit of doubt from the judge." Szymoniak used her share of the settlement to start the Housing Justice Foundation, a non-profit that attempts to raise awareness of the continuing corruption of the nation's courts and land title system.

Most of official Washington, including President Obama, wants to wind down mortgage giants Fannie Mae and Freddie Mac, and return to a system where private lenders create securitization trusts, packaging pools of loans and selling them to investors. Government would provide a limited guarantee to investors against catastrophic losses, but the private banks would make the securities, to generate more capital for home loans and expand homeownership.

3

That's despite the evidence we now have that, the last time banks tried this, they ignored the law, failed to convey the mortgages and notes to the trusts, and ripped off investors trying to cover their tracks, to say nothing of how they violated the due process rights of homeowners and stole their homes with fake documents.

The very same banks that created this criminal enterprise and legal quagmire would be in control again. Why should we view this in any way as a sound public policy, instead of a ticking time bomb that could once again throw the private property system, a bulwark of capitalism and indeed civilization itself, into utter disarray? As Lynn Szymoniak puts it, "The President's calling for private equity to return. Why would we return to this?"

Update: This story previously suggested that banks settled this lawsuit with the federal government for $1 billion. That number is actually the total for a number of whistle-blower lawsuits that were folded into a larger National Mortgage Settlement. This specific lawsuit settled for $95 million. The post above has been changed to reflect this fact.

- See more at: http://www.occupy.com/article/foreclosure-fraud-revealed-your-mortgage-documents-are-fake#sthash.BV2D3Du2.dpuf

4

(3)

State of New York
County Court        County of Erie

_____

KEYBANK NATIONAL ASSOCIATION,

                              Plaintiff, Error

-vs-

DEBORAH A. BUCZEK,

                        Defendant, Error

_____

P A I D

CHECK_____ CASH_____

APR 27 2015

ERIE COUNTY
CLERK'S OFFICE

Index No. 2015600022

**Affidavit in Support of Motion for Dismiss and Notice of Motion to Default Judgement for lack of personal jurisdiction, and defective and improper service pursuant to N.Y. CVP. LAW § 306; NY Code - Section 306: Proof of service § 312-a**

Comes now Deborah Ann Buczek, the original issue and holder in due course Third Party Plaintiff, by special visitation and not appearing generally, before this court seeking a remedy in Admiralty as is provided by "The Saving to the Suitors Clause" at USC 28 -1333(1). I respectfully request the indulgence of this court as I am not schooled in law. This is provided by the precedent set by **Haines vs. Kerner** at 404 U.S. 519.

I am the Deborah Ann Buczek real **OWNER OF THE ACCOUNT** and the Real Party of Interest in care of 7335 Derby Road Derby New York in the above entitled action and as such I have personal knowledge with the facts of this action and the proceedings herein.

**See Attachment (A)**

1

1.) **N.Y. CVP. LAW § 3012: NY Code - Section 3012: Service of pleadings**

(a) Service of pleadings. The complaint may be served with the summons. A subsequent pleading asserting new or additional claims for relief shall be served upon a party who has not appeared in the manner provided for service of a summons. In any other case, a pleading shall be served in the manner provided for service of papers generally. Service of an answer or reply shall be made within **twenty days** after service of the pleading to which it responds.

In this case, no such answer or waiver exists. Since the plaintiff has failed to establish proper standing, its application for an order to dismiss Complaint should be granted at this time. See **JOHNSON v. BORO MED. CTR. LOCAL NO. 563 120 A.D.2d 642** (1986) Charlotte Johnson, Appellant, v. Boro Medical Center Local No. 563, Respondent Appellate Division of the Supreme Court of the State of New York, Second Department. May 19, 1986(finding that the defendant was never properly served)

2.) **CPLR § 3012 (a) & (b**) provides that the "Service of the demand shall extend the time.

A.) (a) Service of pleadings. The complaint may be served with the summons. A subsequent pleading asserting new or additional claims for relief shall be served upon a party who has not appeared in the manner provided for service of a summons. In any other case, a pleading shall be served in the manner provided for service of papers generally. Service of an answer or reply shall be made within twenty days after service of the pleading to which it responds.

B.) (b) Service of complaint where summons served without complaint. If the complaint is not served with the summons, the defendant may serve a written demand for the complaint within the time provided in subdivision (a) of rule 320 for an appearance. Service of the complaint shall be made within twenty days after service of the demand. Service of the demand shall extend the time to appear until twenty days after service of the complaint. If no demand is made, the complaint shall be served within twenty days after service of the notice of appearance. The court upon motion may dismiss the action if service of the complaint is not made as provided in this subdivision. A demand or motion under this subdivision does not of itself constitute an appearance in the action.

C.) (d) Extension of time to appear or plead. Upon the application of a party, the court may extend the time to appear or plead, or compel the acceptance of a pleading untimely served, upon such terms as may be just and upon a showing of reasonable excuse for delay or default.

3.) **CPLR § 2103(b) (2)** provides that "where a period of time prescribed by law is measured from the service of a paper and service is by mail, five days shall be added to the prescribed period."

4.) Therefore Plaintiff, Error had 69 days from February 17, 2015 or until April 27, 2015 to serve their answer or make an appropriate motion to extent time to answer. See City of New York v. Chemical Bank, 122 Misc.2d 104, 470 N.Y.S.2d 280 (Sup. Ct. N.Y. Co. 1983) The New York scheme for service of process on an individual, codified in CPLR 308, is well designed to satisfy both the notice and formality requirements, and thus conforms to constitutional standards. (Dobkin v Chapman, supra.) CPLR 308 provides a continuum of methods of service, which, in descending order, have a decreasing probability of according actual notice. Subdivision 1

3

provides for personal delivery to the individual defendant. Since personal delivery ordinarily affords actual notice, and is thus the most desirable form of service, no further acts are required. (CPLR 308, subd 1.) The four alternative *107107 methods require additional acts which make actual notice more likely, or bear additional conditions which recognize that, while alternative forms of service may often be necessary to subject a defendant to the court's jurisdiction, they are less desirable and more subject to abuse, thus requiring greater regulation. "Deliver and mail" substituted service therefore requires both service to a "person of suitable age and discretion" at the defendant's actual place of business, dwelling, or usual place of abode, as well as mailing to his last known residence and filing of proof of service. (CPLR 308, subd 2.) Service on a designated agent requires the signing and filing, prior to service, of a written designation, effective for only three years. (CPLR 308, subd 3; 318.) "Nail and mail" service requires affixation of the summons to the door of the defendant's place of business, dwelling or place of abode, plus mailing and filing, and proof that personal delivery or "deliver and mail" substituted service cannot be made by "due diligence." (CPLR 308, subd 4.) Finally, court-ordered expedient service requires both prior application and proof that other methods are impracticable. (CPLR 308, subd 5.)

Good faith is implicit in the spirit of the statutory scheme. If a plaintiff knows, or should know, that service according to the letter of the statute will not afford notice, then, by definition, it is not reasonably calculated to afford notice, and is constitutionally infirm. (See, e.g., S.P.S.G., Inc. v Collado, 113 Misc.2d 167 ["attempts" to serve process, at time or locations where the plaintiff knows the defendant will not be found, held not "reasonable application" under RPAPL 735, or "due diligence" under CPLR 308, subd 4].) Of course, the law recognizes that there are some situations, as where "persons [are] missing or unknown, [in which] employment of an indirect

4

and even a probably futile means of notification is all that the situation permits". (Mullane v Central Hanover Trust Co., 339 U.S. 306, 317, supra.) Indeed, upon a showing that service according to any of the prescribed methods is impracticable, a plaintiff may apply, ex parte, for a judicially fashioned alternative which, under the circumstances, is the most likely to afford notice. (CPLR 308, subd 5.) Such alternatives, including publication, may involve highly *108108 unlikely means of affording notice, but are constitutional if reasonable and necessary under the circumstances and if judicially approved in advance. (See Dobkin v Chapman, supra.) No such showing was attempted here; there is no indication that service cannot otherwise be made in an acceptable manner.

"Deliver and mail" service is clearly the next best alternative to personal delivery. It requires actual physical delivery of the summons, to a responsible party who lives or works with the defendant. Coupled with mailing, it should provide a reasonable likelihood of giving actual notice, since the law correctly presumes that such responsible persons are likely to promptly pass the summons on to its intended recipient. The underlying purpose of giving notice might not be satisfied when the summons so served inadvertently goes astray. That, however, is not jurisdictionally fatal, since service was formally made in compliance with statute and in a manner calculated to give notice, thereby satisfying due process considerations. (See Nuez v Diaz, 101 Misc.2d 399.)

Where, however, service is not made in compliance with statute, e.g., where summons was mailed to defendant's place of business rather than his last known residence (e.g., Glikman v Horowitz, 66 A.D.2d 814), the service is fatally defective; even if the defendant does receive notice, the requirement of a formal, jurisdiction-acquiring sovereign act is not met. Where "deliver and mail" substituted service is made pursuant to CPLR 308 (subd 2) on a person not of

suitable age and discretion, the formality requirement is not met and the purpose of giving notice

may not be met. Also See Civil Court, City of New York, New York County. HOUSE OF

BOWERY CORP., Petitioner, v. Susan ENSLEY, et al., Respondents. Decided: September 30,

1999

5.) I have not received an answer for defective service from Plaintiff, for dismissal for lack of

personal jurisdiction, and defective and improper service.

6.) These Plaintiffs have not requested an <u>extension of time</u> to answer nor has one been granted.

7.) **FURTHERE MORE** : Key National  has not demonstrated right to the debt in the absence of

a chain of custody and proof that the Mortgage and Notes were lawfully assigned to and held by

Key National prior to the commencement of this action and accordingly that the plaintiff lacks

standing to foreclose. The underlying action for lack of personal jurisdiction, and defective and

improper service pursuant to N.Y. CVP. LAW § 306 should be granted and Complaint

dismissed. **See Attachment (B)**

8.) **Mortgages and Deeds of Trusts Often Require a Breach Letter:**

Mortgages and deeds of trusts often contain a clause that requires the lender to send a notice,

commonly called a breach letter or demand letter, informing you that your loan is in default

before it can accelerate the loan and proceed with foreclosure. (The acceleration clause in the

mortgage permits the lender to demand that the entire balance of the loan be repaid if the

borrower defaults on the loan.)The Pretend lender never loan a penny and is not the holder in due

course in this matter.

The breach letter generally must specify:

**a.)**   **the default**

**b.)**   **the action required to cure the default**

**c.)**   **a date (usually not less than 30 days from the date the notice is given to the borrower) by which the default must be cured, an**

**d.)**   **that failure to cure the default on or before the date specified in the notice may result in acceleration of the debt and sale of the property.**

Since mortgages and deeds of trust are contracts, the lender must strictly comply with the terms to properly foreclose. The lender or servicer <u>neglected</u> to send the breach letter the pretend lender has never did this process. **<u>Key Bank Attorneys FEIN.SUCH & CRANE, LLP- Mark K.Broyles, David.P.Case, BRANDY, BOWMAN THIRD PARTY TRESPASSER. Failed all four (4) points</u>**

9.) <u>Obligation to Negotiate in Good Faith</u>; "Lack of good faith" Hearing CPLR 3408(f) mandates that the parties "shall negotiate in good faith to reach a mutually agreeable resolution, including a loan modification, if possible." CPLR 3408 (f); see also, 22 NYCRR 202.12-a(c) (4) ("[t]he court shall ensure that each party fulfills its obligation to negotiate in good faith.")The Court may grant a "lack of good faith" hearing on oral application. Where lack of good faith on the plaintiff's part is alleged, compliance with the good faith requirement of CPLR 3408 is not established by proving the absence of fraud or malice on the part of the lender. Instead, the Court will base a determination of good faith, or lack of good faith, on the totality of the circumstances presented. Wells Fargo Bank, N.A. v. Van Dyke, 101 A.D.3d 638, 958 N.Y.S.2d 331 (1st Dept. 2012).

The record and the file shall show bad faith presented by FEIN.SUCH & CRANE, LLP- Mark K.Broyles, David.P.Case, BRANDY, and BOWMAN THIRD PARTY TRESPASSER lacking standing.

**Attachment (C)** Notice of Error & Request for Information requarding Loan ending in 4950 letter of David P. Case, Esq Dated 2/24/2015 and Fein, Such & Crane, LLP not the Real Party Dated March 12, 2015

10.) Silence constitutes an implied representation  of the existence of the state of facts in question and will operate as estoppels.  "Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading."

Wherefore, Deborah Ann Buczek requests that a default judgment be entered against the KEYBANK NATIONAL ASSOCIATION, FEIN, SUCH & CRANE, LLP Mark K.Broyles, Esq. FKNC2913 and Dave Case Esq., pursuant to CPLR § 3215(a) or in the alternative an order that proceedings for the entry of a judgment where the plaintiffs who have not answered pursuant to CPLR § 3215(d) have agree and stipulated to the terms that they have no standing nor jurisdiction and the matter must be dismiss with prejudice.

## ACKNOWLEDGMENT

I, Deborah Ann Buczek, Your Affiant, being competent to testify and being over the age of 21 years of age, after first being duly sworn according to law to tell the truth to the facts related herein states the she has firsthand knowledge of the facts stated herein and believes these facts to be true to the best of her knowledge. I affirm under the penalties of perjury 28 USC Section 1746(1). "Silence can only be equated with fraud where there is a legal or moral duty to speak or when an inquiry left unanswered would be intentionally misleading." U.S. v. Tweel, 550 F.2d 297 (1977).

Sincerely,

Date 04/27/2015 AD

Deborah Ann Buczek

## CERTIFICATE OF SERVICE

I, HEREBY CERTIFY that a true and correct copy of the foregoing <u>Affidavit in Support of</u>
<u>Motion for Dismiss and Notice of Motion to Default Judgement for lack of personal jurisdiction,</u>
<u>and defective and improper service pursuant to N.Y. CVP. LAW § 306: NY Code - Section 306:</u>
<u>Proof of service § 312</u>-aNOTICE OF NO CONSENT, NOTICE OF TRESPASS has been mail
out first class United State mail on April 27th, 2015.


BY:  _Deborah A Buczek_

OWNER OF THE ACCOUNT
Deborah-Ann: Buczek ™, Beneficiary
Secured Party Lien Creditor, Authorized Signatory
Attorney-in-fact on behalf of
DEBORAH A. BUCZEK, Ens Legis, Trademark
UCC Filing No. 201405120259837
ALL RIGHTS RESERVED- UCC 1-308

9

# Attachment (A)