Recording requested by and
When recorded return to:
Owner of the account
**Deborah Ann Buczek**
**Postal Office 43**
**Lake View, New York** *near* [14085]

**April 15, 2015**

Assessor Number: LIBER 8832 PAGE332-333 & SBL. 206.04-2-22(Erie County Clerk's Office)
Instrument Line Number:        329002524950
Customer Loan Number:        9013004769
Property Address:        Care of 7335 Derby Road Derby New York-Private Property
ACAPS Number:        082731601310C
Formal Notice Sent CERTIFIED MAIL: 7013 3020 0000 8956 8796: **FEIN, SUCH & CRANE**
**28 Main Street Suite 1800 Rochester New York [14614] Mark K. Broyles & David P Case**

Space above this line for Recorder's use only

## NOTICE OF PRETEND LENDER'S DEFAULT
7013 3020 0000 8956 8796

Pretend Lender: **KeyBank**                **Owner of the Account: Deborah Ann Buczek**
TAX I.D. 34-1586030

**FEIN,SUCH & CRANE, LLP** is not the Real Party of interest lacking proper notice not given
on October 9, 2014. NON CONSENT TO CONTRACT THAT THIRD-PARTY
TRESPASSERS THAT ARE NOT ALLOWED INTO THIS CONTRACT with Mark
K.Broyles, David P. Case and BRANDY BOWMAN, FORECLOSURE SPECIALIST
TRESPASSER'S.

**This is a notice that the pretend lender has defaulted on their claim on the above Deed of
Trust in full accordance with the Administrative Procedures Act of 1946 for the property
described as:**

SBL. 206.04-2-22 care of 7335 Derby Road Derby New York listed as Private Property

Pretend Lender was given 30 days to present to the Borrower proof of claim to the Borrower's
**Verification of Debt and Proof of Claim Request.** Pretend Lender was unable to produce
proof of claim, therefore Lender can not be a party to enforce the security instrument pursuant of
U.C.C. - ARTICLE 3 -§3-301 and the Real Estate Settlement Procedures Act (RESPA).
**A.)First notice received** on February 9, 2015 Certified Mail: 7014 2120 0001 9319 5124, 10:33
am (UCC 11 Search & notice of good faith Discovery Notice Verification of Proof of Claim with
Intent to file Suit in Federal Court)
**B.)Second Notice received** on February 23, 2015, 10:50 am Delivered by Certified Mail 7013
3020 0000 8956 8932 (Qualified Written Request) non-response by Key National

Pursuant of U.C.C. - ARTICLE 3 -§3-501 (b) 2 (1),The Owner of the account is entitled to verify through visual inspection of the **MY ORIGINAL BLUE WET INK SIGNATURE PROMISSORY NOTE, allonge, and all assignments, together with the ORIGINAL BLUE WET INK Deed of Trust in Erie County** upon demand. **Pretend Lender only produced a photocopy of the instrument with no signature from Pretend Lender Key National. Also, a contract needs 2 signatures, the pretend lender and Owner of the account Deborah Ann Buczek. The only signature was sign by the <u>owner of the account</u> where is the Pretend lenders signature to validate the contract?**

Pursuant of U.C.C. - ARTICLE 3 -§3-302, Pretend Lender was requested to provide proof that they are the Note **<u>Holder of Due Course</u>**. A photocopy of the instrument is **not sufficient proof of holder of Due Course.** Pretend Lender was asked specifically to clarify via affidavit or bank assay stipulating whether or not they are a creditor following Generally Accepted Accounting Principles (GAAP) **whereby true double entry book accounting was performed in issuing the loan showing a debit against the bank's assets as a result of the loan. Lender failed to provide proof as required by law.**

N.Y. Lien Law 190 – Corporate mortgages against real and personal property
§ 190. Corporate mortgages against real and personal property and no liens filed accordance with part five of article nine of the uniform commercial code in any county where the mortgage is recorded, but filing in accordance with that part in the **<u>department of state only is required to perfect a security interest in the personal property or fixtures covered by such a mortgage hereafter recorded.</u>**

On January 29,2015 and Amended February 20,2015, as a matter of courtesy, the Pretend Lender was given an additional 10 days to comply expiring on March 2,2015. The Pretend Lender was informed that failure to provide proof as requested will result in an administrative default.

As of this date, Pretend Lender has not answered the Owner of account's **<u>qualified written request</u>** point by point as required by law.

Owner on Title hereby declare that the Pretend Lender's Promissory note is **<u>null and void</u>** from this date forward.

Pretend Lender is hereby notified that they are in default and can no longer lay claims on this property or the Owner of the account Deborah Ann Buczek.

Pretend Lender is hereby given notice that they have 72 hours upon certified receipt of this Notice to enter a rebuttal. Failure to enter a rebuttal means that the Pretend Lender admit to having no claims to this Deed of Trust and thereby forever release all claims against the Owner of the account and this property. The Pretend Lender will have entered a "no contest" to this notice.

After the 72 hours, the Pretend Lender will **have exhausted their administrative remedy** on this matter. **They can no longer lay claim on Owner of the account or this property from that date forward.**

If the Pretend Lender or the Pretend Lender's Trustee attempt to sell or foreclose on this property after this default declaration, then they do so knowing they have no standing or right of enforcement. Therefore, doing so will make them **guilty of extortion, theft and fraud**. All **Federal felonies punishable with prison times**. Some of the applicable Federal criminal statutes which may be charged in connection with Mortgage Fraud include:

18 U.S.C. § 1001 - Statements or entries generally
18 U.S.C. § 1010 - HUD and Federal Housing Administration Transactions
18 U.S.C. § 1014 - Loan and credit applications generally
18 U.S.C. § 1028 - Fraud and related activity in connection with identification documents
18 U.S.C. § 1341 - Frauds and swindles by Mail
18 U.S.C. § 1342 - Fictitious name or address
18 U.S.C. § 1343 - Fraud by wire
18 U.S.C. § 1344 - Bank Fraud
42 U.S.C. § 408(a) - False Social Security Number
18 U.S.C. Section 1951

**The AFFIDAVIT OF WILLIAM McCAFFREY** with 30 years in the Banking industry and employment for federal insured institutions including a decade as Business Development Manager, Indy Mac Bank FSB and currently Consultant, Housing Mortgage Consultants Inc. has said in a sealed report that the agreement is null and or void and including lack of notice, which is an essential element of due process and also in question here.

Should the Pretend Lender's Trustee attempt to proceed with a foreclosure action, they do so at their full commercial liability and shall be named a co-defendant against them in a wrongful foreclosure civil action for 3 x the loan amount. I affirm under the penalties of perjury 28 USC Section 1746 (1).

By: _Deborah Ann Buczek_

Deborah Ann Buczek-All Rights Reserved
OWNER OF THE ACCOUNT
New York Department of State
Filing No. 201405120259837

STATE OF NEW YORK, COUNTY OF ERIE   ss:
On _April 15 2015_ before me personally came _Deborah Ann Buczek_
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, the individual(s) or the person on behalf of which the individual(s) acted, executed the instrument.

[Owner of the account-Natural], Trustor and Grantor

JEREMY MAJEWICZ
Notary Public - State of New York
No. 01MA6321981
Qualified in Erie County
My Commission Exp. 03/30/2019



STATE OF NEW YORK, COUNTY OF ERIE, SS.

I, Christopher L. Jacobs, Clerk of said County, and also Clerk of Supreme and County Courts of said County, do hereby certify that I have compared the annexed copy with the original filed in my office and that the same is a correct transcript therefrom and of the whole of said original.

WITNESS my hand and seal of said County and Courts on _____ day of __APR 27 2015__ 20___.

/s/

County Clerk

(4)

State of New York
County Court         County of Erie

_____

KEYBANK NATIONAL,
                          Plaintiff,

-vs. -                                              Index No. 2015600022

Deborah-Ann:Buczek
Owner of the Account
                          Defendant,

_____

NOTICE OF REMOVAL FEDERAL QUESTION'S WESTERN DISTRICT OF NEW YORK
FEDERAL COURT HOUSE BUFFALO NEW YORK (BUFFALO DIVISION) pursuant to
Rule 11 of the Federal Rules of Civil Procedure

        Deborah Ann Buczek has filed a notice of removal by transferring a case from state court

to federal court. It is provided for by federal statute. 28 U.S.C. §§ 1441-1453; Fed. R. Civ. Pro.

81(c). State courts have no role to play in determining whether a case is removed or not – a

defendant can remove a case if it elects to do so and the case could have been filed in federal

court in the first place.

1.) Federal Question in Violation of the Under the Fair Debt Collection Practices Act. See

Attachment Affidavit of WILLIAM McCAFFREY –loan charge off non –accrual debt and no

longer bankable.

2.) Federal Question on Failure to state a claim upon which relief can be granted 12 (b).  "Failure

to state a claim upon which relief can be granted"

3.)Federal Question Truth in lending Cases (TILA) include: TILA itself, the Federal Reserve

Board's Regulation Z codified under the Code of Federal Regulations - 12 CFR Part 226 Truth

In lending (Regulation Z), United States Code, and case law. TILA (Truth in lending Act, 15

RESCISSION: If lender does not disclose, then there was no consummation, no loan contract on

1

a Disclosure issue USC §1601. RESCISSION: If lender does not disclose, then there was no consummation, no loan contract on a Disclosure issue. See On Jan. 13, 2015, the United States Supreme Court issued its long-awaited ruling in Jesinoski v. Countrywide Home Loans, Inc., No. 13-684, 2015 WL 144681 (U.S. Jan. 13, 2015) resolving a circuit split over the notice requirements that must be complied with under the Truth In Lending Act (TILA), 15 U.S.C. § 1601 et seq., for rescission of a home mortgage loan.

4.) Once a case has been removed from state to federal court, the state court no longer has jurisdiction over the matter, though a federal court can remand a case to state court. A federal judge can remand a case without any request by the plaintiff if the judge does not believe federal jurisdiction has been properly established by the defendant. A plaintiff can also move to have the case remanded to state court if the plaintiff does not believe federal jurisdiction exists. In some cases, where the basis for removal is "federal question" jurisdiction (where a claim is based on federal law) and that claim is later dismissed, leaving only state law claims, a judge may decline to exercise jurisdiction over the remaining state law claims, and they can be re-filed in state court. However, in general once case has been removed to federal court it stays there until fully resolved.

5.) Federal Question Jurisdiction

Federal question jurisdiction exists when a claim arises pursuant to a federal law. For example, if a plaintiff alleges a claim pursuant to the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, etc., the case presents a "federal question" and can be removed to federal court. In addition,

2

certain state claims that present a "substantial federal question" can also be removed on the basis of federal question jurisdiction. For example, a state consumer fraud claim that contends that a defendant violated the state statute by acting "unlawfully," where the "unlawful" conduct is alleged to be a violation of a federal statute, may present a federal question even though the claim is actually brought pursuant to state law. Also, certain state court claims are pre-empted by federal law, and thus present federal questions. (28 U.S.C. § 1331)The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

Five Requirements to Foreclose or Repossess

First, the lending institution must enter into the court record, the original "Note" and the original "Mortgage" document as of the date the Complaint or Counter Complaint was filed. The problem is that the lending institution does not have the originals anymore. Immediately after completing the closing, the lending institution sold the "Note" and the "Mortgage" to a group of investors and turned over the original "Note" and "Mortgage " to the investor group. "The four primary asset classes currently securitized are residential mortgages, automobile receivables, credit card receivables and student loans, which represent approximately 52%, 19% 16% and 9% or more respectively." The original lending institution no longer has any capitol at risk. Based on this requirement, the foreclosure suit cannot go forward. However, the revenue officer, the so-called judge counts on the abysmal ignorance of the Citizen losing their home and the judge proceeds to steal the property.

Second, the lending institution must file an affidavit of ownership, which identifies in this case the DEFENDANT or Counter-Plaintiff as the "Real Party in Interest" with all attending rights,

3

title and interest in the "Mortgage". When the lending institution sold the "Note" and the "Mortgage", they stopped being the "Real Party in Interest".

Third, "Standing" is an absolute pre-requisite to filing a lawsuit. There are three lawful requirements for "Standing".

1.      Injury in fact – not a hypothetical injury.

2.      Causality – that the actions of the homeowner created the injury in fact.

3.      Redressability – which the judgment will make the injured party whole.

Thus without "Standing" a lawsuit cannot go forward.

Fourth, in order for a contract to be valid and binding, there must be "Consideration". "Consideration" means "something of value". The Citizen borrowing Federal Reserve Notes brings in his real estate, "something of value", to the table in exchange for paper called Federal Reserve Notes. So then, one must ask a few basic questions in regards to this transaction. When the bank loaned the borrower Federal Reserve Notes, did the bank go to the vault and take Federal Reserve Notes on deposit and loan these to the borrower?

Just ask any banker friend and he will tell you that "No" they do not loan out their deposits. So then, how are the Federal Reserve Notes "produced"? The bank goes to their computer and by the use of their "magical, Hollywood wand", a few keystrokes, produce out of thin air, say $100,000.00 Federal Reserve Notes to loan you. This is where "Credit" comes from. One second before, these Federal Reserve Notes did not exist. Now, by magic, the bank has $100,000.00 worth of Federal Reserve Notes to lend you. So, if creating "something of value" out of thin air is real, then it is easy for me to convince you that I own ocean front property in Arizona. There is a caveat here at this point. Before the bank or mortgage company create "credit", also known as Federal Reserve Notes, it needs to have on hand some collateral. You signed two

4

major documents at the "closing", the "Note" and "Mortgage" or "Deed of Trust". Most Americans do not realize how valuable their signature on documents is. The Mortgage document serves as the collateral needed by the bank (from this line forward when I say bank, I also mean mortgage company).

When you sign the "Mortgage", the bank turns it into "money" and deposits it into a special secret account set up in your name. By the magic of "banking", your signature is needed to "monetize" the "mortgage". To the bank, the "mortgage" document is actual money.

Now Under 18 USC the "Mortgage" becomes a negotiable instrument, also known as a "Security". Hence, you the borrower, by your signature, created a "Security" for the bank. Which in turn, the bank, converts into "money".

Now here is where it gets fun. Now that the bank has "money" that it deposited into your secret, undisclosed account, it can loan you your own "money" back at interest. The bank must balance its books, so the bank writes a "hot check" against the "money" in your secret account to "pay off" your debtor. Then your bank demands that the bank receiving their "hot check" pay them back with Federal Reserve Notes. Now the bank turns to you and says, "Now that we loaned this money, you owe us for the next thirty years".

However, the "money deposited into your secret, undisclosed bank account", is still there. The bank considers this secret, undisclosed account abandoned. Thus, they lay claim to the "money". When the bank deposits your "Mortgage money" into your special, secret account, you owned your home free and clear. The bank neglects to inform you of this little tidbit of information. Pretty convenient and self-serving isn't it?

You would think that the bank would be satisfied with this transaction. After all, it has risked nothing, got your home for free and enslaved you for the next thirty years.

5

The bank then turns around and sells your "Mortgage" to Wall Street through groups of investors, for full value. Now this is coming to full fruition. The bank has now gotten paid twice on your signature on the "Mortgage" document. KeyBank has never had a PROOF OF CLAIM and lacks an injury! This is a Formal Notice of removal to the federal court in Buffalo New York.

Under penalty of perjury, I affirm that the information contained in this document is true and correct to the best of my knowledge.  All Specific Rights are explicitly reserved, without prejudice, U.C.C. 1-308, Common Law, Law of Nations.

Auto Graph: _Deborah A Buczek_

Deborah Ann Buczek All Rights Reserved UCC 1-308

August 25, 2015

6

ARIZONA DOCUMENT SERVICES , LLC
azdocuments@icloud.com | CLDP #81339

1

2    DEBORAH A BUCZEK

3                                            **AFFIDAVIT OF**
4    IN RE: REAL PROPERTY:                   **WILLIAM McCAFFREY**
     7335 DERBY ROAD
5    DERBY, NEW YORK
6    14047

7    I William McCaffrey, declare as follows:

8

9    I formulate this Affidavit and analysis based on my own personal knowledge.  I have no

10   direct or indirect interest in the outcome of the case at bar for which I offer my

11   observations, analysis, opinions and testimony.  My experience in the Banking industry

12   encompasses over 30 years employment for federally insured institutions including a

13   decade as Business Development Manager, Indy Mac Bank FSB, and currently Consultant,

14   Housing Mortgage Consultants Inc.

15

16   I have personal knowledge and experience to render opinions in the topic areas related to

17   the securitization of mortgage loans, derivative securities, the securities industry, Uniform

18   Commercial Code practices, predatory lending practices, Truth in Lending Act

19   requirements, loan origination and underwriting, accounting in the context of securitization

20   and pooling and servicing of securitized loans, assignment and assumption of securitized

21   loans, creation of trusts under deeds of trust, and issuance of asset backed securities and

22   specifically mortgage-backed securities by special purpose vehicles in which an entity is

23   named as trustee for holders of certificates of mortgage backed securities, the economics

24   of securitized residential mortgages during the period of 1985-2013, appraisal fraud, and its

25   effect on APR disclosure, usury and foreclosure of securitized and non-securitized

     residential mortgages.
26

27

28

ARIZONA DOCUMENT SERVICES , LLC
azdocuments@icloud.com | CLDP #81339

I have served as Expert Witness in numerous civil and criminal cases. I have testified in both Federal and Superior State Court including Nevada, Arizona, California, Texas, New Jersey, New Mexico, Florida, and South Carolina. Cases include Marshall and Isley Bank v. Izzo, Slikker v. Kondaur, Brokalakis v. National City Mortgage, and Wells Fargo Bank v. Dutson. Superior Court Judges' Ronan, Garcia, and Budoff, and Federal Bankruptcy Judges Markell and Riegle of Nevada, as well as Commissioners' Davis, Ellis, and Hamner have affirmed my expert testimony.

I am also a Securitization Analyst and can access corporate trust documents officially filed with the Securities and Exchange Commission and can find Notes held by named Trust-Entities, and verify the status at any given time. I have the knowledge and experience to perform these searches with accuracy.

I have been contracted here by Ms. Buczek to review her Commercial Home Equity Line of Credit allegedly securing the 7335 Derby Road property and the balance due to Key Bank National Association. I submit this affidavit and analysis:

October 7, 2008 Ms. Buczek signed a Commercial Home Equity Line of Credit with Key Bank National Association. The Interest rate was variable and the principal amount was $50,000. The loan funded on October 11, 2008 and matures on October 11, 2043 (EXHIBIT I).

October 7, 2008 Ms. Buczek also signed The Key Equity Options Agreement (EXHIBIT II) having an Equity Line#3290025254950 on this commercial line of credit.

AFFIDAVIT of William McCaffrey

ARIZONA DOCUMENT SERVICES , LLC
azdocuments@icloud.com | CLDP #81339

1
2  Discussion
3  Due to Commercial loans suffering from a decline in the economy or in revenues or future
4  profits, banks implement "confirming events" for commercial credit.
5
6  A confirming event occurs when information reveals the loan is no longer bankable and is
7  charged off "charge-off" loans.
8
9  The charge-off is based on established "thresholds."
10
11  Thresholds are specific number of days past due since delinquency statistics are the most
12  common indicators of the level of inherent loss. In commercial loans, specific adverse
13  information about borrowers also causes a charge off.
14
15  My research looking up this loan, shows equity Line #3290025254950, was charged off.
16
17  According to the OCC, When loans are charged-off the bank is required place them in
18  non-accrual status.
19  Moreover, according to the OCC, When loans are charged-off the bank can no longer
20  collect on a non-accrual debt.
21
22  In the loan here, according to the Commercial loan Department from KeyBank's
23  Commercial Loan Statement. (EXHIBIT III) It appears they are attempting to collect on the
24  debt.
25
26  Further, the interest was still occurring, therefore leaving the balance at a superficially
27  inflated amount.
28

AFFIDAVIT of William McCaffrey

ARIZONA DOCUMENT SERVICES , LLC
azdocuments@icloud.com | CLDP #81339

Based on my research and pursuant to my decades of relevant experience within the banking industry, this loan is uncollectable by KeyBank and even if it were, the amount is extremely inflated. FURTHER AFFIANT SAYETH NAUGHT.

_____
William McCaffrey

SWORN TO AND SUBSCRIBED before me, the undersigned notary public this

6 Day of _____August_____ 2015.

NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
AARON ARGANDONA
My Commission Expires October 23, 2015

_____
Notary Public

AFFIDAVIT of William McCaffrey

ARIZONA DOCUMENT SERVICES , LLC
azdocuments@icloud.com | CLDP #81339

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

AFFIDAVIT of William McCaffrey

pg 6 of 19)

# HOME EQUITY LINE OF CREDIT
## MORTGAGE

| BORROWER | MORTGAGOR | |
|---|---|---|
| DEBORAH A. BUCZEK | DEBORAH A. BUCZEK | MARRIED |
| ADDRESS | ADDRESS | |
| 7335 DERBY RD | 7335 DERBY RD | |
| DERBY, NY 14047 | DERBY, NY 14047 | |
| TELEPHONE NO.      IDENTIFICATION NO | TELEPHONE NO.      IDENTIFICATION NO. | |

THIS IS A LINE OF CREDIT MORTGAGE AS DEFINED IN SECTION 281 OF THE REAL PROPERTY LAW. THE PARTIES TO THIS MORTGAGE REASONABLY CONTEMPLATE ENTERING INTO A SERIES OF ADVANCES OR ADVANCES, PAYMENTS AND READVANCES. THE MAXIMUM AMOUNT AUTHORIZED TO BE OUTSTANDING AT ANY ONE TIME IS STATED BELOW.

**WORDS USED OFTEN IN THIS DOCUMENT**

(a) "Security Instrument." This document, which is dated October 07, 2008 , will be called the "Security Instrument."

(b) "Borrower." The Borrower(s) are identified above. If any or all of the Borrowers and the Mortgagors described above are the same person(s), then all references to Mortgagor in this Mortgage shall apply to such Borrower.

(c) "Lender." KeyBank National Association
4910 Tiedeman Road, Suite C, Brooklyn, OH 44144

(d) "Mortgagor." The Mortgagor(s) are identified above. If any or all of the Mortgagor(s) described above are the same person(s), then all references to Borrower in this Mortgage shall apply to such Mortgagor(s). If any one Mortgagor does not sign the promissory notes or agreements evidencing the Obligations described below

(i) that Mortgagor is signing this Security Instrument only to give that Mortgagor's rights in the Property under the terms of this Security Agreement;

(ii) that Mortgagor is not personally obligated to pay the Obligations, and

(iii) that Mortgagor agrees that Lender may agree with the other Mortgagors to delay enforcing any of Lender's rights or to modify or to make any accommodations with regard to the terms of this Security Instrument or the Obligations without that Mortgagor's consent

(e) "Obligations." The following promissory note(s) and other agreement(s) signed by the Borrower:

| INTEREST RATE | PRINCIPAL AMOUNT/ CREDIT LIMIT | FUNDING/ AGREEMENT DATE | MATURITY DATE | CUSTOMER NUMBER | LOAN NUMBER |
|---|---|---|---|---|---|
| VARIABLE | $50,000.00 | 10/11/08 | 10/11/43 | 082731601310C | |

(f) "Property." The property that is described in Schedule A and in the section titled "Description of the Property," will be called the "Property."

(g) "Sums Secured." The amounts described below in the section titled "Mortgagor's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**MORTGAGOR'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

Mortgagor mortgages, grants and conveys the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, Mortgagor is giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. Mortgagor is giving Lender these rights to protect Lender from possible losses that might result if Mortgagor or Borrower fails to

(a) Pay, with interest, all the amounts owed Lender, as stated in the promissory notes and agreements, and any extensions, modifications and/or renewals (including any extensions, modifications and/or renewals that amend the Draw Period) of such promissory notes and agreements, which evidence the Obligations,

(b) Pay, with interest, any amounts that Lender spends under Paragraphs 2 and 5 of this Security Instrument to protect the value of the Property and Lender's rights in the Property, and

(c) Keep all other promises and agreements under this Security Instrument

This Mortgage shall secure existing debts Borrower may now owe Lender and any future advances under the Obligations, whether the Lender is obligated to make such future advances or whether they may be made at the Lender's option, as if such future advances were made on the date Mortgagors signed this Mortgage. The Sums Secured shall not exceed at any time the maximum principal amount of $ 50,000.00 plus interest, plus any advances made for the payment of taxes, levies or insurance on the Property with interest. Any such future advances may be made either prior to or after the due dates of the Obligations secured by this Mortgage. This Mortgage is given for the specific purpose of securing any and all indebtedness of the Borrower and the Mortgagor to Lender (but in no event shall the secured indebtedness exceed at any time the maximum principal amount set forth in this paragraph) in whatever manner this indebtedness may be evidenced or represented until this Mortgage is satisfied of record. All covenants and agreements contained in this Mortgage shall be applicable to all advances made by Lender to Borrower or Mortgagor under this future advance clause

**DESCRIPTION OF THE PROPERTY**

Mortgagor gives Lender rights in the Property described in Schedule A which is attached to and part of this Mortgage, and:

(a) All buildings and other improvements that are located on the Property described in Schedule A;

(b) All rights in other property that Mortgagor has as owner of the Property described in Schedule A. These rights are known as "easements and appurtenances attached to the Property";

(c) All rights that Mortgagor has in the land which lies in the streets or roads in front of, or next to, the Property described in Schedule A,

(d) All fixtures that are now or in the future will be on the Property described in Schedule A,

(e) All of the rights and Property described in subparagraphs (a) through (d) of this section that Mortgagor acquires in the future; and

(f) All replacements of or additions to the Property described in subparagraphs (a) through (e) of this section.

PARCEL-BLOCK-LOT #: 14448920604000020220

**MORTGAGOR'S RIGHT TO MORTGAGE THE PROPERTY AND MORTGAGOR'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
Mortgagor promises that: (a) Mortgagor owns the Property; (b) Mortgagor has the right to mortgage, grant and convey the Property to Lender; and (c) there are no outstanding claims or charges against the Property, except for those which are of public record, which are described in Schedule B.

Mortgagor gives a general warranty of title to Lender. This means that Mortgagor will be fully responsible for any losses which Lender suffers because someone other than Mortgagor has some of the rights in the Property which Mortgagor promises that Mortgagor has. Mortgagor promises that Mortgagor will defend Mortgagor's ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**
This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary, to a limited extent, in different parts of the country. Mortgagor's promises and agreements are stated in "plain language."

**COVENANTS**

Mortgagor promises and agrees with Lender as follows:

**1.   BORROWER'S PROMISE TO PAY**
Borrower has promised to pay to Lender on time principal and interest due under the Obligations and any prepayment and late charges due under the Obligations.

**2.   PAYMENTS FOR TAXES AND INSURANCE**
Mortgagor will pay all amounts necessary to pay for taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), hazard or property insurance covering the Property, and flood insurance (if any).

**3.   MORTGAGOR'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
Mortgagor will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. Mortgagor will also make payments due under Mortgagor's lease if Mortgagor is a tenant on the Property and Mortgagor will pay ground rents (if any) due on the Property. Mortgagor will do this either by making the payments to Lender that are described in Paragraph 2 above or, if Mortgagor is not required to make payments under Paragraph 2, by making the payments on time to the person owed them. (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If Mortgagor makes direct payments, then promptly after making any of those payments Mortgagor will give Lender a receipt which shows that Mortgagor has done so. If Mortgagor makes payment to Lender under Paragraph 2, Mortgagor will give Lender all notices or bills that Mortgagor receives for the amounts due under this Paragraph 3.

Mortgagor will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require Mortgagor to satisfy a superior lien if: (a) Mortgagor agrees, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which Mortgagor agrees to pay that obligation; or (b) in good faith, Mortgagor argues or defends against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced; or (c) Mortgagor secures from the holder of the other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Mortgagor a notice identifying the superior lien. Mortgagor shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**4.   MORTGAGOR'S OBLIGATION TO MAINTAIN HAZARD INSURANCE OR PROPERTY INSURANCE**
Mortgagor will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender. Mortgagor may choose the insurance company, but Mortgagor's choice is subject to Lender's approval. Lender may not refuse to approve Mortgagor's choice unless the refusal is reasonable. If Mortgagor does not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 6 below.

All of the insurance policies and renewals of these policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, Mortgagor will promptly give Lender all receipts of paid premiums and renewal notices that Mortgagor receives.

If there is a loss or damage to the Property, Mortgagor will promptly notify the insurance company and Lender. If Mortgagor does not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration, or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument, or (c) Lender and Mortgagor have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under the Security Instrument, then the proceeds will be used to reduce the amount that Borrower and/or Mortgagor owes to Lender under the Obligations and then to the amount Mortgagor owes to Lender under this Security Instrument. If any of the proceeds remain after any amount that Mortgagor owes to Lender has been paid in full, the remaining proceeds will be paid to Mortgagor.

If Mortgagor abandons the Property, or if Mortgagor does not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which Borrower and/or Mortgagor owes to Lender under the Obligations, that use will not delay the due date or change the amount of any of the payments under the Obligations and under Paragraphs 1 and 2 above.

If Lender acquires the Property under Paragraph 19 below, all of Mortgagor's rights in the insurance policies will belong to Lender. Also, all of Mortgagor's rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

**5.   MORTGAGOR'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; LOAN APPLICATION**

   (a) Mortgagor's Obligations to Maintain and Protect the Property
Mortgagor will keep the Property in good repair. Mortgagor will not destroy, damage or harm the Property, and Mortgagor will not allow the Property to deteriorate.

Mortgagor will be "in default" under this Security Instrument if Mortgagor fails to keep any promise or agreement made in this Security Instrument. Mortgagor also will be in default under this Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, a legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Security Instrument or Lender's rights in the Property. Mortgagor may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that the court ruling prevents forfeiture of Mortgagor's interests in the Property and also prevents any material impairment of (i) the lien created by this Security Instrument or (ii) Lender's rights in the Property. If Mortgagor corrects the default, Mortgagor will have the right to have enforcement of this Security Instrument discontinued, as provided in Paragraph 19 below, even if Lender has required immediate payment in full.

**(b) Mortgagor's Obligations to Fulfill Any Lender Obligations**
If Mortgagor does not own but is a tenant on the Property, Mortgagor will fulfill all Mortgagor's obligations under the lease. Mortgagor also agrees that, if Mortgagor acquires the fee title to the Property, Mortgagor's lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**(c) Loan Application**
If, during the application process for the Obligations, Borrower made false or inaccurate statements to Lender about information important to Lender in determining Borrower's eligibility for the loan, Lender will treat this action as a default under this Security Instrument. Also, if during the loan application process Borrower fails to provide Lender with information important to Lender in determining Borrower's and/or Mortgagor's eligibility for the loan, Lender will treat this as a default under this Security Instrument.

**5.   LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**
If  (a) Mortgagor does not keep Mortgagor's promises and agreements made in this Security Instrument, or (b) someone, including Mortgagor, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture, or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 6, Lender does not have to do so.

Mortgagor will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 6. Mortgagor will pay these amounts to Lender when Lender sends Mortgagor a notice requesting that Mortgagor do so. Mortgagor will also pay interest on those amounts at the highest rate stated in the Obligations. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and Mortgagor may agree in writing to terms of payment that are different from those in this paragraph. This Security Instrument will protect Lender in case Mortgagor does not keep this promise to pay these amounts with interest.

**7.   LENDER'S RIGHT TO INSPECT THE PROPERTY**
Lender, and others authorized by Lender, may enter on and inspect the Property. Lender must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give Mortgagor notice stating a reasonable purpose for the inspection.

**8.   AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY**
A taking of property by any governmental authority by eminent domain is known as "condemnation." Mortgagor gives to Lender Mortgagor's right:  (a) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (b) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount owed to Lender has been paid in full, the remaining proceeds will be paid to Mortgagor.

Unless Lender and Mortgagor agree otherwise in writing, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking either is equal to, or greater than, the amount of the Sums Secured immediately before the taking, the amount owed to Lender will be reduced only by the amount of proceeds multiplied by a fraction. That fraction is as follows:  (a) the total amount of the Sums Secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to Mortgagor.

Unless Lender and Mortgagor agree otherwise in writing or unless the law requires otherwise, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking is less than the amount of the Sums Secured immediately before the taking, the proceeds will be used to reduce the Sums Secured.

If Mortgagor abandons the Property, or if Mortgagor does not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal owed to Lender under the Obligations, that use will not delay the due date or change the amount of any of the payments under the Obligations and under Paragraphs 1 and 2 above.

**9.   CONTINUATION OF BORROWER'S AND MORTGAGOR'S OBLIGATIONS AND OF LENDER'S RIGHTS**
**(a) Borrower's Obligations**
Lender may allow a person who takes over Borrower's rights and obligations to delay or to change the amount of the payments of principal and interest due under the Obligations or under this Security Instrument. Even if Lender does this, however, that person and Borrower will both still be fully obligated under the Obligations and Mortgagor will still be fully obligated under this Security Instrument.

Lender may allow those delays or changes for a person who takes over Borrower's rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Obligations or under this Security Instrument, even if Lender is requested to do so.

**(b) Lender's Rights**
Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 19 below to demand that Mortgagor make immediate payment in full of the amount that Mortgagor owes to Lender under this Security Instrument.

**10.  OBLIGATIONS OF MORTGAGOR AND OF PERSONS TAKING OVER MORTGAGOR'S RIGHTS OR OBLIGATIONS**
Any person who takes over Mortgagor's rights or obligations under this Security Instrument will have all of Mortgagor's rights and will be obligated to keep all of Mortgagor's promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Mortgagor, each Mortgagor is fully obligated to keep all of Mortgagor's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each Mortgagor individually or against all Mortgagors together. This means that any one Mortgagor may be required to pay all of the Sums Secured.

**11.  LOAN CHARGES**
If an Obligation secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Obligation exceed permitted limits:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Obligations or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Obligations.

**12.  NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to Mortgagor under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to Mortgagor at the address stated in Schedule A. A notice will be given to me at a different address if I give Lender a notice of Mortgagor's different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to Lender's address stated in this Mortgage. A notice will be mailed to Lender at a different address if Lender gives Mortgagor a notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 12 or of applicable law.

**13.  LAW THAT GOVERNS THIS SECURITY INSTRUMENT**
This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of any Obligation conflicts with the law, all other terms of this Security Instrument and of the Obligation will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument and of the Obligations which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

**14. MORTGAGOR'S COPY**
Mortgagor will be given one conformed copy of this Security Instrument.

**15. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial Interest in Mortgagor is sold or transferred and Mortgagor is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

**16. MORTGAGOR'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED**
Even if Lender has required immediate payment in full, Mortgagor may have the right to have enforcement of this Security Instrument discontinued. Mortgagor will have this right at any time before sale of the Property under any power of sale granted by this Security Instrument or at any time before a judgment has been entered enforcing this Security Instrument if Mortgagor meets the following conditions:

(a) Mortgagor pays to Lender the full amount that then would be due under this Security Instrument and Borrower pays to Lender the full amount owed under the Obligations as if immediate payment in full had never been required, and

(b) Mortgagor corrects Mortgagor's failure to keep any of Mortgagor's other promises or agreements made in this Security Instrument; and

(c) Mortgagor pays all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees to the extent permitted by law; and

(d) Mortgagor does whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and Mortgagor's obligations under this Security Instrument continue unchanged.

If Mortgagor fulfills all of the conditions in this Paragraph 16, then the Obligations and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, Mortgagor will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 1 above.

**17. HOLDER'S RIGHT TO SELL THE NOTES OR AGREEMENTS OR AN INTEREST IN THE NOTES OR AGREEMENTS**
The promissory note(s) or agreement(s) evidencing the Obligations, or an interest in such notes or agreements, together with this Security Instrument, may be sold one or more times. Mortgagor may not receive any prior notice of these sales.

**18. CONTINUATION OF MORTGAGOR'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY**
The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection are called "Environmental Laws." Mortgagor will not do anything affecting the Property that violates Environmental Laws, and Mortgagor will not allow anyone else to do so.

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Paragraph 18. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Laws and the substances considered hazardous for purposes of this Paragraph 18 are called "Hazardous Substances."

Mortgagor will not permit Hazardous Substances to be present on the Property. Mortgagor will not use or store Hazardous Substances on the Property, and Mortgagor will not allow anyone else to do so. Mortgagor will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and Mortgagor will not allow anyone else to do so. However, Mortgagor may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and Mortgagor may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

If Mortgagor knows of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, Mortgagor will promptly notify the Lender in writing. If the government notifies Mortgagor (or Mortgagor otherwise learns) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, Mortgagor will promptly take all necessary remedial actions as required by Environmental Laws.

**19. LENDER'S RIGHTS IF BORROWER OR MORTGAGOR FAILS TO KEEP PROMISES AND AGREEMENTS**
If Borrower or Mortgagor fails to keep any promises and agreements and except as provided in Paragraph 15 above, Lender may require that Borrower pay immediately the entire amount then remaining unpaid under the Obligations and Mortgagor pay immediately the entire amount due under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of Mortgagor's remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount Mortgagor owes Lender, which fees shall become part of the Sums Secured.

**20. LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**
When Lender has been paid all amounts due under the promissory notes or agreements evidencing the Obligations and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. Mortgagor will not be required to pay Lender for the discharge, but Mortgagor will pay all costs of recording the discharge in the proper official records.

**21. AGREEMENTS ABOUT NEW YORK LIEN LAW**
Borrower will receive all amounts lent to Borrower by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, Borrower will (a) hold all amounts received, and which Borrower has a right to receive from Lender under the Obligations as a "trust fund", and (b) use those amounts to pay for that construction or work before Borrower uses them for any other purpose. The fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property, Borrower has a special responsibility under the law to use the amounts in the manner described in this Paragraph 21.

**22. ASSIGNMENT OF RENTS**
Mortgagor absolutely and unconditionally assigns and transfers to Lender all of the rents and revenues ("Rents") of the Property, regardless to whom the Rents of the Property are payable. Mortgagor authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Mortgagor shall receive the Rents until (i) Lender has given Mortgagor a notice of default pursuant to this Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

**23. ADDITIONAL TERMS:**

(p 10 of 19)

Mortgagor acknowledges that Mortgagor has read, understands, and agrees to the terms and conditions of this Mortgage, and acknowledges receipt of an exact copy of same.

Dated this 7th _____ day of _October 2008_ _____

MORTGAGOR   DEBORAH A. BUCZEK               MORTGAGOR

DEBORAH A. BUCZEK
MORTGAGOR                                    MORTGAGOR

MORTGAGOR                                    MORTGAGOR

MORTGAGOR                                    MORTGAGOR

STATE OF NEW YORK   }
                    } SS.:
COUNTY OF _Erie___

On the _7__ day of _Oct__, in the year _2008_ before me, the undersigned, personally appeared _Deborah A. Buczek___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

## SCHEDULE A

The following described real property located in the County of _ERIE_____, State of _New York____.

See Addendum A

SUSAN R. CAHILL
Notary Public, State of New York
My Commission Expires Nov. 27, 2010

COLLATERAL ADDRESS: 7335 DERBY RD DERBY, NY 14047

## SCHEDULE B

BORROWER AND LENDER REQUEST THE HOLDER OF ANY MORTGAGE, DEED OF TRUST OR OTHER ENCUMBRANCE WITH A LIEN WHICH HAS PRIORITY OVER THIS MORTGAGE TO GIVE NOTICE TO LENDER, AT LENDER'S ADDRESS SET FORTH ON PAGE ONE OF THIS MORTGAGE, OF ANY DEFAULT UNDER THE SUPERIOR ENCUMBRANCE AND OF ANY SALE OR OTHER FORECLOSURE ACTION.

THIS INSTRUMENT WAS PREPARED BY:          AFTER RECORDATION RETURN TO:
KeyBank National Association              KeyBank National Association
David G. Fisher                          First American ELS - Policy Dept
                                         P.O. Box 6899
                                         Cleveland, OH 44101

ADDENDUM A

Borrower Name: BUCZEK, DEBORAH            Customer Number:   082731601310C

A PARCEL OF LAND SITUATED IN THE STATE OF NEW YORK, COUNTY OF ERIE, WITH A
STREET LOCATION ADDRESS OF 7335 DERBY RD; DERBY, NY 14047-9636 CURRENTLY
OWNED BY DEBORAH A BUCZEK HAVING A TAX IDENTIFICATION NUMBER OF
144489-205-040-0002-022-000 AND FURTHER DESCRIBED AS 4.01AC.

ARIZONA DOCUMENT SERVICES , LLC
azdocuments@icloud.com | CLDP #81339

1
2
3
4
5
6
7
8
9
10
11
12  # EXHIBIT II
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT of William McCaffrey

Page 1  of  9)



## KeyBank

# KEY EQUITY OPTIONS AGREEMENT

Meaning of Words: In this Agreement the words "we" "us" and "our" mean KeyBank National Association ("KeyBank") __4910 Tiedeman Road, Suite C, Brooklyn, OH 44144__ The words "you" and "your" mean jointly and severally
__DEBORAH A. BICZEK__

__7335 DERBY RD_____ DERBY, NY 14047____
(Borrower(s) Name(s) and Residence) and the word "Agreement" means this Key Equity Options Agreement

Terms of Agreement: This Agreement governs the use of your Key Equity Options line of credit account (the "Account") with us It describes your variable rate, open-end, revolving line of credit with us (the "Variable Rate Portion") and the Fixed Rate Option by which you may elect to repay certain advances against your line ("Line") of credit at a fixed interest rate for a specified term

## I. KEY EQUITY OPTIONS AGREEMENT

1. Credit Limit: An approved Line of $ __50,000.00_____ ("Credit Limit") is established for your Key Equity Options Account  During the draw period, you may obtain advances ("Advance"), repay and then obtain additional Advances, provided such Advances would not cause your Credit Limit to be exceeded  Your Credit Limit will be reduced by Advances taken against your Account and by the amount of any Fixed Rate Option(s) which you elect to take  During the draw period, any amount(s) you repay against the outstanding principal balance of the Variable Rate Portion or any Fixed Rate Option will increase the amount of credit available to you accordingly. During the repayment period, you will no longer be entitled to obtain Advances.  You agree not to request an Advance which would cause the total of Advances outstanding, together with all other sums owed under this Agreement (including finance charges and other charges), to exceed the Credit Limit.  You further agree not to use any such Advances for any purpose expressly prohibited in any Rider to this Agreement which is incorporated into this Agreement;

2. Access to Your Account: You may obtain and direct Advances from your Account, up to your Credit Limit, as follows
   A.  Cash Advance  You may request a Cash Advance in person at designated branches during normal business hours.

   B.  Telephone Transfer  You may request an Advance from us if you have a deposit account with us and have been approved for telephone transfers, by making a telephone transfer request for a specified sum to be advanced under your Account and deposited in a deposit account that is maintained with us  In order to access your Account by telephone transfer you must maintain one or more eligible deposit accounts with us throughout the term of this Agreement, including the term of any Fixed Rate Option.  No separate minimum balance or usage requirements for those deposit accounts are imposed under this Agreement;

   C.  Overdrafts-Linked Account (NOT AVAILABLE IN CONNECTICUT AND NEW YORK)  If you have a demand deposit account with us that is linked to your Account, you may access your Account by an overdraft of that linked deposit account (the "Linked Account") up to the amount of your Credit Limit  Only one deposit account may be linked to your Account for the overdraft protection.

   The linking of a deposit account to your Account is optional, but you will not enjoy any overdraft privileges unless you do link a deposit account to your Account.  If the Linked Account becomes overdrawn, funds will automatically be transferred to the Linked Account in an amount sufficient to cover the overdraft.  Overdrafts of the Linked Account will be covered up to the amount of your available Credit Limit whether the overdraft occurs through charges or other debits to the Linked Account or your accessing the Linked Account  The person(s) who signed the Agreement as Borrower(s) must also be the same and only person(s) who are identified as owners of the Linked Account;
   ☐ If this box is checked, you elect to use your Key Equity Options Account as overdraft protection on your KeyBank
   Checking Account Number _____; and
   D.  KeyEquity Card.  (THE KEYEQUITY CARD IS NOT AVAILABLE IN CONNECTICUT OR NEW YORK)  You will be issued and agree to accept a KeyEquity Card credit card.  All transactions you make with the Key Equity Card will be treated as an Advance and posted to your Account as of the date of the transaction, and

   E.  Equity Line Checks.  Your Account may be accessed by special Equity Line Checks ("Checks") provided by us.  You will receive these Checks imprinted with your Account number.  The amount of each Check will be treated as an Advance and posted to your Account

3.  Promise to Pay: You promise to pay all amounts outstanding on your Account, including any fees and charges we impose.  If more than one person signs this Agreement, you agree that (i) we can enforce our rights against each of you individually or against all of you together and (ii) we can send Account statements, notices and any other correspondence to either of you.

4.  Security: You are giving us the right of setoff and a mortgage/deed of trust security interest on your Residence or the real estate located at __7335 DERBY RD_____ DERBY, NY 14047_____ ("Property")
(Address if different than above)  You agree to execute a mortgage deed or deed of trust ("Security Instrument") giving us a security interest in this real estate.  All Advances up to the Credit Limit, which we are obligated to make under this Agreement, will be secured by the Security Instrument.  Except for the liens described in the Security Instrument, you will not permit, create or allow any other encumbrance or lien on this real estate without our prior written consent  We will consider any default by you under the Security Instrument a default in the material obligations under this Agreement.  You could lose your Property if you don't meet the obligations in your Agreement with us  Other property held by us as

pe 2  of  9)

## KEY EQUITY OPTIONS AGREEMENT

collateral securing other loans (unless the other property is the principal residence of any person having an ownership interest in that property) may also secure your Account

5. **Key Protect:** You are not required to obtain accidental loss of life, natural loss of life or accidental disability debt cancellation protection (collectively referred to as "debt cancellation protection") as a condition of obtaining credit under this Agreement, If we have offered you debt cancellation protection and you have elected to purchase it from us, you authorize us to add the cost of the debt cancellation protection fee to your Account each monthly billing cycle. If you want this optional protection, you must complete a separate application. We may allow you to exceed the Credit Limit temporarily from time to time to accommodate these debt cancellation fee amounts and you may be charged an Over Limit fee. The amount of debt cancellation protection available for purchase may not be sufficient to cover the entire outstanding balance of your Account

6. **Term/Minimum Monthly Payment:** *Draw Period* The length of the Draw Period during which you can obtain Advances against your Account is twenty (20) _____ years ( 240 months ) During the Draw Period, payments are due monthly You agree that during the Draw Period you will make payments equal to the required minimum payment for both the Variable Rate Portion and any Fixed Rate Option(s) ("Minimum Monthly Payment"). In addition to the required minimum payment for both the Variable Rate Portion and any Fixed Rate Option(s), your Minimum Monthly Payment will also include any past due amounts, and any fees, charges or debt cancellation fees. The Minimum Monthly Payment may not fully repay the principal outstanding on your Account.

You are required to pay us immediately all amounts exceeding your Credit Limit. The amount of your payment may change because the Annual Percentage Rate ("APR") is variable on the Variable Rate Portion. You promise to pay us the unpaid balance of Advances plus the Finance Charges, calculated at the daily periodic rate, and any additional charges permitted by this Agreement. Rate information will be provided on the monthly statements that we send you

A. Variable Rate Portion: Required Minimum Payment (Select one of the following payment options.)

☐    Interest Only      An amount equal to accrued Finance Charges. (Not available in Connecticut.)

☒    Regular Payment      An amount equal to the greater of (a) 1/240th of the unpaid balance of Advances plus accrued Finance Charges or (b) $100.00, and all previously billed but unpaid minimum payments to your Account. Balances of less than $100.00 must be paid in full

B. **Fixed Rate Option:** You agree to repay any Fixed Rate Option ("Option") in consecutive, substantially equal monthly payments at the interest rate, for the term, and with such other conditions as agreed upon at the time you exercise the Option. The monthly payment due on any Option will be an amount of principal and interest sufficient to amortize the Option over the term selected by you at the time the Option is exercised. This payment will be in addition to and combined with the required minimum payment due for your Variable Rate Portion as described in the Agreement. Disclosure of the required minimum payment due on the Option will be based on an estimated disbursement date.

If at the time that the Variable Rate Portion of your Account matures you still owe money under the terms of any Option(s), you shall continue to make payments on such Option(s) according to the terms and conditions of the Option confirmation notice(s) (which are incorporated into this Agreement by reference) and according to this Agreement

7. **Term/Minimum Monthly Payment:** *Repayment Period.* The Repayment Period begins the first day after the Draw Period ends and continues for fifteen (15) _____ years ( 180 months ) After the Draw Period ends, you will not be able to obtain any more Advances or exercise any Options and you will begin to repay the outstanding balance on your Variable Rate Portion by making consecutive monthly payments. During the Repayment Period, payments will be due monthly. Your monthly payment for the Variable Rate Portion will be computed, at the beginning of the Repayment Period and each year thereafter, to yield the monthly payment amount necessary to fully amortize the outstanding balance, together with Finance Charges, over the remaining term at the then current APR. There will be a minimum payment of $100 for the Variable Rate Portion during the Repayment Period and if your principal balance is less than $100, the full amount will be due. If the accrued Finance Charges for any given billing period on the Variable Rate Portion exceed the monthly payment for that same billing period, your monthly payment will be equal to the accrued Finance Charges for that billing period. The Minimum Monthly Payment due on your Account during the Repayment Period will include any monthly payment due on your Variable Rate Portion, any monthly payments due on your Option(s), any past due amounts, any fees charged to your Account, and any debt cancellation fees

8. **Variable Rate Portion. Prime Rate Index:** You must pay a Finance Charge on all Advances from the date each Advance is made until we receive payment in full. The Finance Charge is figured separately for both the Variable Rate Portion and any Fixed Rate Option(s). The Index used by us to determine the Finance Charge for the Variable Rate Portion is the "Prime Rate" as published in the Wall Street Journal "Money Rates" table ("Index"). The Index is published in each edition of the Wall Street Journal. Where more than one Prime Rate is published in any edition, the Index will be the highest of the Prime Rates set forth. The Prime Rate is just a pricing index and is not necessarily the lowest rate charged by us or any other lender. If the Index becomes unavailable for whatever reason, we will choose another Index which is also readily available and verifiable by you and which is beyond our control. We will notify you of the substitute or replacement Index. We may also change the margin if the Index becomes unavailable. The selection of any replacement Index and margin will be done in compliance with applicable law

9. **Fixed Rate Option. Fannie Mae Index:** You must pay a Finance Charge on the Option from the date you exercise the Option until we receive payment in full. The Index used by us to determine the Finance Charge for the Option(s) is equal to Fannie Mae's required net yield, as of the business day prior to the date that you exercise the Option, for 30-year fixed rate mortgages covered by applicable 30-day mandatory delivery commitments as published in the Wall Street Journal "Money

UN_KBNA KEOP/KEON Agreement        Page 2        Line # 329005524950
Rev 09/2008                                                    ACAPS # 002731601110C

### KEY EQUITY OPTIONS AGREEMENT

le ("FRO Index"). The FRO Index is published in each edition of the Wall Street Journal. If the FRO Index havailable for whatever reason prior to the date you exercise an Option, we will close another FRO Index which idily available and verifiable by you and which is beyond our control. We will notify you of the substitute or nt FRO Index. We may also change the margin(s) disclosed below if the FRO Index becomes unavailable. The selection of any replacement FRO Index and Margin(s) will be done in compliance with applicable law.

**10. Maximum Annual Percentage Rate:** Your maximum APR is 18.0%, which is a Daily Periodic Rate of .049315% (.049180% in a leap year). Your APR may change by any amount on any Change Date not to exceed the maximum APR.

**11. Minimum Annual Percentage Rate:** Your minimum APR is 3.49%, which is a Daily Periodic Rate of .009561% (.009536% in a leap year). Your APR may change by any amount on any Change Date, but will not be less than the minimum APR.

**12. Variable Annual Percentage Rate:** *Variable Rate Portion* Your Account has a variable rate feature. The APR and the minimum payment can change as a result. The APR is based on the value of the Index ("Index") described above. To determine the APR that applies to your Account we [X] add [ ] subtract a Margin of 1.10 % to the value of the Index. The APR does not include costs other than interest. The APR on your Account may change daily. If the Index increases in value (assuming the same outstanding balance), the APR and minimum payment will also increase. If the Index decreases in value (assuming the same outstanding balance) the APR and minimum payment may decrease, but the minimum payment during the Draw Period will always be at least the accrued Finance Charges, if you chose the interest only payment option, or the lesser of $100 or the outstanding balance, if you chose the principal plus interest payment option. During the Repayment Period, the minimum payment will always be at least the lesser the lesser of $100 or the outstanding balance. If the Daily Periodic Rate increases, a lesser portion of your minimum payment may be applied to principal and a greater portion will be applied to Finance Charge. The APR does not take into account your optional Linked Account.

The date on which your APR could change is called "Change Date"

**13. Finance Charge:** *Variable Rate Portion* We figure the daily Finance Charge on your Account by multiplying the Daily Balance by the Daily Periodic Rate then in effect. Then we add all of the daily Finance Charges together to get the total accrued Finance Charge for the billing cycle. The Daily Balance is figured this way: we take the beginning principal balance (which excludes unpaid Finance Charges [except for financed closing costs, if any]), each day and add to it any new debit amounts (each of which is posted as of the effective date of the transaction). The principal balance includes the amount of the Advance and any other items that are financed, such as closing costs, if any. Next we subtract payments and credits posted to the Account's principal balance (each of which is posted as of the effective date of the transaction). This gives us your Daily Balance. (For purposes of figuring the Daily Balance, we will not subtract any payment or portion thereof, that is in excess of the principal balance. For each day there is a balance in excess of the principal balance ("credit balance"), we will use zero in place of the credit balance.) We determine a daily periodic rate by dividing the "Annual Percentage Rate" by the number of days in a year (365 or 366). Your periodic rates may vary.

The Finance Charge does not include costs other than interest. The Finance Charge does not take into account your optional Linked Account. Payment in full of the new balance by the due date will not avoid the assessment of Finance Charges on the balances from the date shown on your monthly statement through the date paid. Finance Charges begin to accrue as of the effective date of the Advance or charge. There is no grace period.

**14. Initial Disclosure:** *Variable Rate Portion.*

[X]  If this box is checked, the APR as of 10/05/08 is 6.10 %, which is a Daily Periodic Rate of 0.016666667 %. This rate may change daily

The initial APR is based on the Index and margin used for later rate adjustments.

**A. Promotional Rate Discount**

[ ]  If this box is checked, the initial APR is n/a %, which results in a Daily Periodic Rate of n/a %. The initial APR is "discounted." This initial APR is based on the Index [ ] plus [ ] minus a margin of n/a %. The initial index plus/minus a margin will remain in effect through n/a . After the discounted period, the APR that will apply is the Index then in effect [ ] plus [ ] minus a margin of n/a % which, as of n/a , is n/a % APR and a Daily Periodic Rate of n/a %.

The initial APR is not based on the margin used for later rate adjustments.

[ ]  If this box is checked, you must agree to take a minimum initial advance of n/a at the time the Account is opened in order to obtain the promotional rate discount. We reserve the right to apply the initial, non-discounted rate to the Account if the required minimum initial advance is not taken

[ ]  If this box is checked, you must have, or agree to open, a deposit account with us in order to obtain the promotional rate discount. We reserve the right to apply the initial, non-discounted rate to the Account if you do not have the required deposit account

**15. Nature of a Fixed Rate Option:** During the Draw Period, you may use the Fixed Rate Option to convert amounts you owe under the Variable Rate Portion of your Account from a variable to a fixed rate of interest. An Option will have a fixed interest rate and specified term, and allows you to repay a specified amount in substantially equal consecutive monthly payments that will be in addition to and combined with any minimum payment on your Variable Rate Portion. An Option

UN_KBNA KEOP/KEOH Agreement
Rev. 09/2008

Page 3

Line # 129002524950
ACAPS # 002731601310C

p 4 of 9)

## KEY EQUITY OPTIONS AGREEMENT

may be for any amount between $5,000 and the amount of the credit remaining on the Variable Rate Portion of your Account. If there is an Option outstanding, your Account will consist of a Variable Rate Portion (reflecting the Advance(s) against the Line) and an Option portion (reflecting the Advances(s) against the Line which you have elected to repay at a fixed rate over a specified term). Your monthly statement will reflect both portions of your Account. You may choose a term between 12 and 180 months. The term of the Option may extend beyond the maturity of the Variable Rate Portion of your Account.

**16. Conditions for Exercising a Fixed Rate Option:** You may exercise an Option if a) you are in the Draw Period; b) no default exists under the terms of the Agreement; c) there are not more than three Fixed Rate Options outstanding after you exercise the Option, d) you have not exercised more than two Options within the previous 365 day period, and e) you sign any request forms that may be required by us to confirm your decision to exercise the Option. In no case may you exceed your Credit Limit by exercising the Option.

**17. Exercising the Fixed Rate Option:** To exercise the Fixed Rate Option call 1-800-KEY2YOU at such times or locations as we tell you.

**18. Finance Charge:** *Fixed Rate Option.* The Finance Charge on the Fixed Rate Option Portion of your Account is made up of the sum of two components as follows A. The first component is calculated by multiplying the Daily Balance for each day by the Daily Periodic Rate then in effect (The Daily Periodic rate is determined by taking the FRO Index in effect, adding the appropriate Margin as described below, and dividing by the number of days in the year (365 or 366)) Then we add all of the daily Finance Charges together to get the total accrued Finance Charge for the statement cycle. B. The second component is the Fixed Rate Option Fee, whether financed or separately paid. (Finance Charge = A+B) The Daily Balance is figured this way we take the beginning principal balance (which excludes unpaid Finance Charges [except for any financed Fixed Rate Option fee] and certain other charges, if any The principal balance includes the amount of the Option and any other items that are financed, such as the Fixed Rate Option fee, if any Next we subtract any payments and credits posted to the Account's principal balance (each of which is posted as of the effective date of the transaction) This gives us your Daily Balance

**19. Initial Disclosures:** *Fixed Rate Option.* To the FRO Index value we will add a Margin of ___1.010___ % for Options between 12 and 60 months, ___1.260___ % for Options of more than 60 months to 120 months, and ___2.010___ % for Options of more than 120 and 180 months  As of ___10/06/08___, the **Daily Periodic Rate** for an Option of 12 to 60 months is ___0.01874317___ %. This is an **APR** of ___6.860___ %.   As of ___10/06/08___, the **Daily Periodic Rate** for an Option of more than 60 to 120 months is ___0.01942623___ %.   This is an **APR** of ___7.110___ %.  As of ___10/06/08___, the **Daily Periodic Rate** for an Option of more than 120 to 180 months is ___0.02347543___ %. This is an **APR** of ___7.860___ %  Once an Option has been established, the Daily Periodic Rate for that Option *will not change*  However, if the Daily Periodic Rate quoted to you for an Option changes before you exercise the Option, the corresponding minimum payment and APR may be different than the one quoted to you  An increase in the Daily Periodic Rate may increase the minimum payment  Notwithstanding any other provision in this Agreement, we do not intend the interest we charge to exceed the maximum rate allowed under applicable law  The APR (shown here) does not include costs other than interest  Finance Charges begin to accrue as of the effective date your Advance is converted to an Option

**A.  Promotional Rates**  We may, in our discretion, offer a promotional rate from time to time to apply to any Option that meets the criteria for the promotional offer and is exercised during the promotional period. If we, in our discretion, choose to offer a promotional rate, the rate will be based on the FRO Index and will be equal to either the FRO Index, the FRO Index plus a reduced Margin, or the FRO Index minus a Margin  Any promotional rate offered will be set by us but will never exceed the rate determined by adding the Margin, stated above, to the FRO Index.  We will tell you the FRO Index and Margin, if any, that will apply to your Option at the time you exercise the Option.

**20. Fixed Rate Option Fee, Finance Charge:** You will pay a Fixed Rate Option fee of $___50.00___ when you elect to exercise an Option  The APR shown on your monthly statement may increase for the month in which the fee is imposed  It may exceed the maximum APR shown above because it includes costs other than interest. This is the second component of the Finance Charge.

**21. Annual Membership Fee:** Your Key Equity Options Account may be charged an annual membership fee of $___0.00___ during the Draw Period whether or not you use the Account, If a membership fee is charged, the membership fee will be charged to your Account upon signing this Agreement and will automatically be charged to your Account annually in the month of the anniversary date of the opening of your Account  The membership fee is non-refundable and you will owe it once it is charged to your Account whether or not your Account is subsequently changed, suspended or terminated for any reason

☐ If this box is checked, the Annual Membership Fee is waived for the first year

**22. Other Fees:** In addition to the Annual Fee, Fixed Rate Option Fee, and Closing Costs described in this Agreement, we charge the following fees.

(a) **Late Fee**  We charge a late fee if we do not receive at least the Minimum Monthly Payment within ten (10) days after the payment due date, as stated on your monthly statement  The late fee for each late Payment will be ten percent (10%) of the Minimum Monthly Payment amount, not to exceed $30 00

(b) **Returned Item Fee**  We may charge a returned item fee if any check or other instrument given for payment on the Account is dishonored for any reason  The returned item fee may be $20 00

(c) **Overline Fee.**  In the event you incur charges in amounts exceeding your Credit Limit, an overline fee in the amount of $20 00 may be charged for each instance where your Credit Limit is exceeded.

(d) **Check Stop Payment Fee.**  A fee of $20 00 may be charged in connection with each Check stop payment order placed by you. A Check Stop Payment Fee is not charged if your Account was opened in Indiana or Maine.

## KEY EQUITY OPTIONS AGREEMENT

(e) KeyEquity Card Replacement Charge. A fee of $10.00 may be charged to replace a KeyEquity Card for any reason.

(f) Discharge Fee. When we discharge or otherwise release the Security Instrument, you will be charged a fee for recording the discharge or satisfaction subject to any limitations applicable law imposes. Based upon current costs, our estimate the fee to be $ 43.50 .

You also agree to pay, if applicable law permits and subject to any limitations applicable law imposes, all costs we incur in collecting amounts owed under this Agreement or in enforcing or defending our rights under this Agreement. These costs may include collection agency fees, attorneys' fees, (which may exceed two percent (2%) of the total principal, interest and costs due), filing fees and court costs.

The above fees will be added to the Minimum Monthly Payment due.

23. Additional Charges: You agree to pay the following charges.

| | | | |
|---|---|---|---|
| (a) Filing Fees | $ 0.00 | (f) Flood Hazard Determination | $ 0.00 |
| (b) Title Search/Title Insurance' | $ 0.00 | (g) Life of Loan Flood Tracking | $ 0.00 |
| (c) Property Appraisal | $ 0.00 | (h) Mortgage Tax | $ 0.00 |
| (d) Credit Report | $ 0.00 | (i) Closing Agent Fee | $ 0.00 |
| (e) Notary | $ | (j) | $ 0.00 |
| | | TOTAL | $ 0.00 |

24. Account Termination Fee: If you voluntarily terminate this Agreement at any time prior to three (3) years from the date hereof, we charge and you agree to pay us a termination fee of $ 450.00

25. Insurance: In connection with the Security Instrument, we require fire and extended Property insurance in an amount equal to all liens on the Property described in the Security Instrument with a mortgagee payable clause in our favor. In addition, we require flood insurance, if applicable, as described in the Security Instrument. Your failure to meet this requirement will constitute an inaction by you that adversely affects our security thereby creating an event of default. This Property insurance will not be provided nor financed by us but may be obtained by you through any insurer acceptable to us. You will deliver to us copies of the insurance policy or policies or a certificate of insurance within thirty (30) days of the date of this Agreement. If you fail to do so or fail to pay the insurance premiums, we may obtain the insurance covering our interest. If we do this, any such amounts shall be assessed to your Account as Advances which will reduce the amount of available credit and you agree to pay such additional Advances. Such amounts may not be covered by the Security Instrument you have granted to us.

26. Reappraisal: You agree that we have the right to inspect and reappraise any Property which secures Advances made under this Agreement, for as long as the Agreement is in effect or as long as any balance owed under the Agreement is still outstanding. If requested, you will give us permission to enter your dwelling and other Property to inspect and reappraise. We will conduct our inspection upon reasonable notice and at reasonable times. We may charge your Account for any costs that we incur in obtaining any reappraisal or in the appraisal review process, even if performed by our employees, up to a maximum of $ 400.00

27. Liability: We have no responsibility for the refusal of any merchants, banks or others to honor the KeyEquity Card and Checks or for any goods or services purchased through the use of your Account.

28. Events of Default: The entire Account balance including any amount owing on the Variable Rate Portion and all Fixed Rate Options will, at our option, become immediately due and payable, after any notice to you required by applicable law, in the event that (a) you fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is any fraud or misrepresentation by you at any time in connection with this Account or (c) any action or inaction by you adversely affects our security or any of our rights in such security. Any action or inaction by you which adversely affects our security, includes, but is not limited to, transfer of title to the Property, sale of the Property without our prior written consent, failure to maintain required insurance on the Property, commission of waste or destructive use of the Property, failure to maintain the Property such that it adversely affects our security, failure to pay taxes on the Property or other action which results in the filing of a senior lien on the Property, your death (in the state of Connecticut, the death of all Borrowers who signed this Agreement), the taking of the Property through eminent domain or illegal use of the Property. (If your Account is secured by a junior or secondary lien on property located in Connecticut and you have paid loan fees, points or similar prepaid finance charges, then any amount owing under this Agreement will, at our option, become immediately due and payable, without notice to you, if a required payment for any outstanding balance is more than sixty (60) days late or any other event described above occurs.)

Our failure to immediately and permanently terminate the Account or accelerate payment or take other permitted actions set forth above shall not prohibit us from taking such action at a later time, as long as the condition still exists at that time. We may prohibit additional Advances or reduce your Credit Limit in the event that (a) the value of the dwelling that secures the Account declines significantly below the Property's appraised value for purposes of the Account. For purposes of this paragraph, a decline in value shall be significant if the value of the dwelling declines such that the initial difference between the Credit Limit and the available equity (based on the Property's appraised value for purposes of the Agreement) is reduced by fifty percent (50%) or more. For example, assume a house with a first mortgage/deed of trust of $50,000 appraised at $100,000 and the credit limit is $30,000. The difference between the credit limit and the available equity is $20,000 ($50,000 - $30,000). If the Property value declines from $100,000 to $90,000, we could prohibit further Advances, (b) we reasonably believe that you will be unable to fulfill the repayment obligations under this Agreement due to a material change in your financial circumstances, (c) you are in default of any material obligations under this Agreement; (d) we are precluded by government action from imposing the APR provided for in the Agreement, (e) the priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than 120% of

# KEY EQUITY OPTIONS AGREEMENT

the Credit Limit, (f) we are notified by our regulatory agency that continued Advances constitute an unsafe or unsound practice; or (g) the maximum APR is reached

In order to reinstate the Agreement, you must send us a written request to that effect. We will only reinstate the Account if we determine to our satisfaction that the condition or reason which caused us to suspend Advances or to reduce the Credit Limit either no longer exists or has been corrected. If an appraisal or title report is required to make such determination, we may charge you for any such fee(s), which will be billed to your Account as an Advance and will not exceed $400 00

29. **No Waiver of Rights:** We may accept late payments or partial payments marked "payment in full" without losing any of our rights under this Agreement. The waiver of any of our rights and remedies at any time will not mean that we have given up or lost the right to exercise any of our rights and remedies at any later time. We may delay in enforcing any of our rights and remedies under this Agreement without losing them. Failure by us to assert any of our rights shall not waive such rights. We may also take any collection action allowed by law.

30. **KeyEquity Card Access:** (THE KEY EQUITY CARD IS NOT AVAILABLE IN CONNECTICUT OR NEW YORK.) If you received a KeyEquity Card with this Agreement, you may access credit available under the Account by using the KeyEquity Card to make purchases, obtain Advances, or obtain cash from automated teller or cash dispensing machine(s) ("Terminal"), subject to the following restrictions.

A. If we issue a personal identification number ("PIN") to you, you may use the KeyEquity Card at a Terminal identified by a service mark appearing on the KeyEquity Card to obtain cash advances only, subject to the limits on amount and frequency, and payment of any surcharge, imposed by the Terminal owner/operator from time to time

B. You may be liable for the unauthorized use of the KeyEquity Card. You agree to notify us promptly, orally or in writing, if the KeyEquity Card is lost or stolen. You may notify us by writing to. Card Service Center, P. O. Box 810012, Toledo, Ohio 43081, or by calling us at 1-800-KEY2YOU (1-800-539-2968). We may charge a fee to replace your KeyEquity Card. Your KeyEquity Card is a credit card, and your liability for unauthorized use of the KeyEquity Card will be limited to the amount of money, property, labor or services obtained by unauthorized use before you notify us, up to a maximum of $50 00. Your liability may be reduced under a network rule of MasterCard International Inc. This rule currently provides that a Cardholder's liability for unauthorized use of a MasterCard-branded credit card or debit card issued by KeyBank may be reduced to zero dollars ($0) if (a) the cardholder (i) has reported to KeyBank the loss or theft of the MasterCard-branded card within twenty-four hours of the Cardholder's discovery of such loss or theft, (ii) has exercised reasonable care in safeguarding the Card from risk of loss or theft, and (iii) has not reported two or more incidents of unauthorized use in the immediately preceding twelve-month period, and (b) the Cardholder's account (in which Card transactions are posted) is in good standing. Under this rule, "unauthorized use" means use of this Card by a person, other than the Cardholder, who does not have actual, implied, or apparent authority for such use, and from which the Cardholder receives no benefit. This rule does not apply to a Card issued (i) to an entity other than a natural person, (ii) primarily for business, commercial, or agricultural purposes, or (iii) outside the U S A.

C. You agree not to assert against us any claims or defenses you may have against any person who honors the KeyEquity Card which arise out of an unresolved dispute as to Property or services rented or purchased with the KeyEquity Card in any credit card transaction (as that term is defined in Federal Reserve Board Regulation Z), unless all of the following conditions are met. (1) the claim is not a tort claim, (2) you have made a good faith attempt to resolve the dispute with the person who honored the KeyEquity Card, (3) the amount of the credit extended to obtain the property or services that resulted in the claim or defense exceeds $50 00, and (4) the purchase or rental transaction occurred in the same state as your current designated mailing address or, if not within the same state, within one hundred miles of that address. You hereby agree transactions made by telephone use of a KeyEquity Card will be deemed to have occurred at the merchant's sales location rather than at your mailing address or the location of the telephone used to make the phone call. You further agree not to assert against us any claim based on anyone's refusal to honor the KeyEquity Card.

D. We are not responsible if a merchant, another bank, or a Terminal refuses to honor the KeyEquity Card or transaction. Such refusal may also be due to our inability or unwillingness to authorize the transaction for any reason. The limits on amount and frequency of transactions that we may authorize may be changed by us, and we may impose other conditions from time to time for security reasons to protect and benefit you. We will not be responsible if authorization for any transaction is not given, and you agree not to assert any claim against us based on any such refusal to honor the KeyEquity Card. Your KeyEquity Card will expire upon the earlier of the expiration date specified on said Card or expiration of the draw period for available credit under the Agreement.

E. Use of the KeyEquity Card is subject to all procedures established by us, or by a participating merchant or bank, or owner or operator of a Terminal which honors the KeyEquity Card. We have the right, at our sole discretion, to deny any transaction which would result in an outstanding principal balance in excess of the Credit Limit. You agree that any KeyEquity Card(s) issued remain our Property and shall be destroyed by you, or may be retrieved by us or our agent, upon cancellation of the Agreement or cancellation of credit available on the Account.

F. Each credit extension made in connection with any transaction at a merchant or cash advance at a Terminal will be an Advance under the Account and will be repayable by all who have signed or otherwise agreed to this Agreement as a "borrower" You and each other borrower will be jointly and severally liable regardless of how many KeyEquity Card(s) are issued and regardless of whether all applicants receive KeyEquity Cards. If anyone uses your KeyEquity Card with actual, apparent or implied authority, or your benefit from the use of the KeyEquity Card, you will be liable for all Advances extended to or for the benefit of that person.

G We reserve the right, from time to time and without notice to you, to limit, restrict, terminate or otherwise modify your KeyEquity Card access to your Account, as well as the terms and conditions in this Agreement governing such access, as long as we allow you to continue to have the right to obtain cash advances on your Account in those other methods and procedures further described in Agreement and to the extent permitted by applicable law.

31. **Cancellation:** You may close your Account as to future transactions at any time by giving us written notice at the address printed on page one of this Agreement. If we issue you a KeyEquity Card or Checks to use to obtain Advances, you agree to be liable for all Advances obtained by any person who uses the KeyEquity Card or Checks with your permission. If

### KEY EQUITY OPTIONS AGREEMENT

...te your Account or you close your Account, you must cut up your KeyEquity Card and return the KeyEquity Card ...s to us. We may cancel your Account pursuant to the terms and conditons of the Agreement set forth above.

...ng or cancellation of your Account for whatever reason will not affect your obligations prior to such closing or cancellation. The terms of the Agreement shall continue to apply to the outstanding balance on your Account until paid in full, except that the Repayment Period will commence at the time of closing or cancellation. Use of the Account after termination or notice of cancellation is fraudulent and you may be subject to legal proceedings.

**32. Tax Deductibility:** You should consult a tax advisor regarding the deductibility of interest and charges under this Account.

**33. Disclosure of Account Information:** We may share information within the KeyCorp family of companies as well as with unaffiliated third parties external to Key as described in our Privacy Policy. You specifically consent to us sharing information within the KeyCorp family of companies and with external unaffiliated third parties. You may elect to opt out of information sharing as described in our Privacy Policy. If you elect to opt out, that election will override this consent to share, except for those instances in which we are otherwise permitted to share by law without your consent.

**34. Review of Credit Line:** You agree to provide us with updated financial information including but not limited to personal financial statements, upon request. This requirement constitutes a material obligation under this Agreement. Failure to provide any such requested updated financial information to us within thirty (30) days of the request shall constitute a default under this Agreement. You agree to inform us in writing of any material change in your financial situation, or any change of your home or mailing address, or if you change your name, within thirty (30) days after such change. You agree we may, from time to time, obtain an updated credit report on you without first notifying you or obtaining your consent.

**35. Stop Payment Procedures:** At your risk and written request, we will, without responsibility on our part so far as we may lawfully limit our liability, accept a stop payment on your Account. An oral stop payment order is binding for only fourteen (14) days unless confirmed in writing within that period. No revocation of the request to stop payment shall be valid unless delivered to us in writing. In order to place a written stop payment request, you must inform us of the exact amount of the item, the number of the check, the date of the check, your Account number, and any other information requested. A stop payment request is effective for only six (6) months, unless you renew it. We are not liable for payment of a check or if a stop payment request has expired and not been removed, if you have not given us sufficient information or if your stop payment request comes too late for us to act on it. We are entitled to a reasonable period of time after we receive your stop payment request to notify our employees and take other action needed to stop payment. You agree that "reasonable time" depends on the circumstances but that we will have acted within a reasonable time if we make your stop payment request effective by the end of the next business day following the business day on which we receive your stop payment request.

**36. Monthly Statement; Limitation on Time to Report Forgeries and Errors:** We will send you a monthly statement for each monthly billing cycle when there is a debit or credit balance of more than $1.00 or when a Finance Charge has been imposed unless your Account is deemed to be uncollectible. The statement will show the number of days in the billing cycle; the beginning balance and the ending balance. The statement will also show the minimum payment amount, the payment due date and your available credit. Your Advances, payments, other charges such as annual membership fees or late charges, or other adjustments will be described as applicable. Any finance charges that you owe will also be shown. You should review your statements promptly after you receive them. You must notify us as soon as possible if you believe there is an error, forgery or other problem with the information shown on your Account statement. You agree that fifteen (15) days after we mailed a statement is a reasonable amount of time for you to review your Account statement and report any errors, forgeries or other problems. This time limit will not affect any rights you may have under the Electronic Fund Transfer Act or the Fair Credit Billing Act (see "Your Billing Rights" notice in this Agreement). In addition, you agree not to assert a claim against us concerning any error, forgery or other problem relating to a matter shown on an Account statement unless you notify us of the error, forgery or other problem within sixty (60) days after we mailed you that statement.

**37. Stop Future Advances:** Each person who signs this Agreement may request us not to permit any additional Advances under the Account. We may continue to honor requests until we have had reasonable time to act upon your request. You agree that we do not guarantee that every request for a future Advance will be rejected after your request. Future Advances may not be obtained until all owners request us in writing to reactivate your Account. If your request is given by telephone, we may require you to confirm the request in writing. You will hold us harmless from any claim by any party for either stopping payment on checks or for ceasing to honor requests for Advances. You will resolve any such claims and will reimburse us for all expenses that we incur in defending any actions or claims brought against us, including reasonable attorneys' fees, whether or not a lawsuit is commenced.

**38. Giving of Notices:** Any notice that must be given under this Agreement will be delivered or mailed to your address shown on our records. Any mailed notice will be considered delivered when actually received or on the third business day after it is mailed, whichever is earlier. Any notice, other than credit card related notices, you send to us is to be sent to the address shown on your monthly statement, unless we notify you otherwise in writing.

**39. Assignment/Severability Clause:** You cannot assign or transfer your rights or obligations under this Agreement to another person. Your Account is not assumable. This is a material obligation. If you attempt to assign your rights or obligations, we can restrict your right to obtain Advances, reduce your Credit Limit; and/or terminate this Agreement and require you to pay us the outstanding balance in full at once. We may assign or transfer this Agreement and the Security Instrument to another party without your consent.